## LONGFELLOW ET AL. *v.* VERNON.

[No. 8,246.   Filed May 15, 1914.   Rehearing denied December 11, 1914.   Transfer denied January 20, 1915.]

1. PHYSICIANS AND SURGEONS.— *Malpractice.— Complaint.— Sufficiency.*—Each of several paragraphs of complaint in an action for malpractice were sufficient to withstand a demurrer, which, in addition to the usual averments, alleged respectively negligence in unskilfully and ignorantly treating plaintiff's limb by failing to make proper diagnosis of the injury which could easily have been done by ordinary diligence, care and skill; negligence in removing adhesive plasters; negligence and lack of skill in placing the limb in a plaster of Paris cast; negligence in failing to properly diagnose the case; in removing the adhesive plaster and in placing the limb in a plaster of Paris cast; negligence in the diagnosis of the case and in failing to discover the dislocation of plaintiff's hip; negligence in failing to diagnose the injury which was alleged to have been a dislocation of the hip, and in the treatment of the limb; and each alleging that by reason of the negligence therein charged disease of the bone and blood poisoning developed, making an operation necessary, etc.   p. 615.

2. PHYSICIANS AND SURGEONS.—*Degree of Skill Required.*—A physician or surgeon acting under a general employment does not undertake absolutely to cure his patient, but he is bound to possess and exercise the average degree of skill and learning possessed and exercised by members of the profession in good standing practising in similar localities at the time, and his

failure to use that reasonable care and diligence ordinarily exercised by members of the profession in similar cases, under like conditions, constitutes negligence. p. 621.

3. PHYSICIANS AND SURGEONS.—*Malpractice.*—*Liability.*—A physician or surgeon is liable to answer in damages for injuries which were proximately caused by his want of such reasonable degree of skill and learning ordinarily possessed by physicians and surgeons practising in similar localities at the time, or by his negligence in the diagnosis of the case or in the treatment of the patient. p. 621.

4. PHYSICIANS AND SURGEONS.—*Malpractice.*—*Acts or Omissions Constituting.*—Failure by a physician or surgeon to exercise the reasonable care and diligence required by the law may be predicated on things done that should not have been done, or on the negligent failure to do or cause to be done something that should have been done in the particular instance. p. 622.

5. PHYSICIANS AND SURGEONS.— *Malpractice.*— *Verdict.*— *Answers to Interrogatories.*—The jury's answers to interrogatories to the effect that a tight bandage will not produce blood poison without first producing gangrene, and that a tight bandage will produce a condition in which there is blood poison in twenty-four hours without first producing gangrene, etc., nullify each other and hence do not control a verdict for plaintiff on a paragraph of complaint for malpractice charging negligent treatment in placing plaintiff's limb in a bandage or plaster of Paris cast which was so tight as to greatly impede and stop circulation, whereby blood poisoning developed and spread to all parts of plaintiff's body. p. 622.

6. PHYSICIANS AND SURGEONS.—*Malpractice.*—*Verdict.*—*Answers to Interrogatories.*—In an action for malpractice in the treatment of plaintiff's limb, the jury's finding in answer to interrogatories that the use of a plaster of Paris cast and the method of applying it to plaintiff's limb were proper, is not in irreconcilable conflict with a verdict for plaintiff, where the complaint charged that the limb was badly swollen, sore and tender, and that the cast was negligently made so tight that by reason thereof, together with the condition and negligent treatment of the limb, the injuries complained of resulted. p. 623.

7. APPEAL. — *Review.* — *General Verdict.* — *Answers tp Interrogatories.*—A general verdict for plaintiff is a finding in plaintiff's favor of every material fact alleged, and in determining the sufficiency of the jury's answers to overcome same the court on appeal will not consider the evidence actually before the jury, but will treat the verdict as supported by any legitimate evidence possible under the issues. p. 623.

8. PHYSICIANS AND SURGEONS. — *Malpractice.*—*Verdict.*—*Answers*

*to Interrogatories.*—In an action for malpractice in the treatment of plaintiff's limb resulting in disease of the bone and blood poisoning, the jury's answers to interrogatories to the effect that osteo-myelitis is accompanied by severe pain from the beginning, and that plaintiff's pain prior to the time adhesive strips were applied by defendants was not caused by that disease, but was due to a sprained ankle, at least warrant the inference that plaintiff did not have osteo-myelitis before she was treated by defendants, and hence are not in conflict with a verdict for plaintiff. p. 623.

9. PHYSICIANS AND SURGEONS.— *Malpractice.— Verdict.— Answers to Interrogatories.*—The jury's finding in answer to interrogatories in a malpractice case, that septicaemia or blood poisoning is a pus infection of the blood produced by a germ, does not conflict with the finding embraced in the general verdict that blood poisoning complained of by plaintiff resulted from the negligent application of adhesives and a plaster of Paris cast to her limb. p. 624.

10. PHYSICIANS AND SURGEONS.—*Malpractice.—Verdict.—Answers to Interrogatories.*—The jury's answer to an interrogatory affirming that it did not find that plaintiff's hip was not dislocated was not in conflict with a verdict for plaintiff which found that it was dislocated; nor did the answer showing that plaintiff's "present condition" is due to osteo-myelitis necessarily show that it could not have resulted from the causes alleged in the complaint, when considered in the light of any legitimate evidence possible under the issues. p. 624.

11. PHYSICIANS AND SURGEONS.—*Malpractice.—Negligent Diagnosis.*—A physician may be liable for his negligence in failing to use ordinary skill and diligence in diagnosing a case. p. 625.

12. PHYSICIANS AND SURGEONS.— *Malpractice.— Evidence.— Sufficiency.*—In an action for malpractice in the treatment of plaintiff's limb, alleged to have resulted in disease of the bone and blood poisoning, evidence supporting the general averments of the complaint as to the employment of defendants, the history of plaintiff's injury and the rendition of the services, together with the testimony of lay witnesses that the attending physicians said that plaintiff had blood poisoning and that it resulted from a tight bandage or other treatment by defendants, and that of medical experts in answer to hypothetical questions that blood poisoning might be produced from treatment such as plaintiff received, that disease of the bone might follow, and that in their opinion plaintiff had blood poisoning, etc., was sufficient to support a verdict for plaintiff. pp. 625, 631.

13. EVIDENCE.—*Opinion Evidence.—Experts.—Nonexperts.*—Where a question depends wholly on scientific or expert knowledge, per-

sons not possessing the requisite skill and knowledge to give their answers probative value are not competent to testify; but the rule does not limit or prescibe the testimony of nonexperts as to particular facts within their knowledge, which may bear upon questions depending for their ultimate solution upon scientific knowledge.    p. 629.

14.  PHYSICIANS AND SURGEONS.—*Malpractice.—Opinion Evidence. —Experts.*—Whether a physician has treated a particular injury properly, or whether a surgical operation was skilfully performed, or whether a particular disease resulted from alleged negligent treatment, and like questions of science, must of necessity depend upon the testimony of physicians and surgeons learned in such matters.    p. 629.

15.  PHYSICIANS AND SURGEONS.—*Malpractice:—Opinion Evidence. —Nonexperts.*—In an action for malpractice facts relating to the treatment of the patient may be stated by nonexperts, though they may be incompetent to give an opinion as to the value or effect of such facts from a medical or surgical point of view. p. 629.

16.  EVIDENCE.— *Opinion Evidence.— Hypothetical Questions.— Experts.*—When facts having some testimony to prove them are stated hypothetically to an expert, and he states his opinion based thereon, such evidence should be considered along with other testimony in the case and be given such weight as the jury, under proper instructions, may deem it to merit, regardless of the fact that all or a part of the statements in such hypothetical question may depend entirely for proof upon the evidence of nonexperts.    p. 629.

17.  PHYSICIANS AND SURGEONS.—*Malpractice.—Negligence.—Expert Testimony.*—The facts may be such in a malpractice case as to enable the jury to find negligence in the treatment of the patient without the aid of expert testimony.    p. 630.

18.  PHYSICIANS AND SURGEONS.—*Malpractice.—Issues.—Evidence. —Admissibility.*—Where the issues in a malpractice case present the question of defendants' want of professional skill and learning, and negligence in failing to exercise ordinary care in the diagnosis and treatment, all the facts and circumstances of the treatment, the condition and conduct of the patient, the acts and conduct of the physicians, their omissions, if any, and any other facts that may throw light upon the questions at issue are proper matters of evidence to be given by any competent witness.    p. 630.

19.  PHYSICIANS AND SURGEONS. — *Malpractice. — Liability.* — The question of negligence or failure of a physician to use ordinary care and skill is to be determined from his acts, conduct, omissions and treatment in the particular instance and does. not depend upon his professional skill and learning.    p. 631.

20. APPEAL.—*Review.*—*Refusal of Instructions.*—Where the instructions fairly and accurately stated the law and covered all the essentials of those tendered, the refusal of the latter was not harmful. p. 631.

From Howard Circuit Court; *William C. Purdum*, Judge.

Action by Mary L. Vernon, by her next friend Addie Vernon, against Thomas W. Longfellow and another. From a judgment for plaintiff, the defendants appeal. *Affirmed.*

*Blacklidge, Wolf & Barnes*, for appellants.
*Bailey & Young*, for appellee.

FELT, J.—This is a suit for damages brought by appellee against appellants for alleged malpractice. The complaint was in six paragraphs, each of which was answered by general denial. The case was tried by a jury and a verdict of $2,500 was returned against appellants, with answers to certain interrogatories. Appellants' motion for judgment on the answers of the jury to the interrogatories, notwithstanding the general verdict, and their motion for a new trial, were overruled, and judgment was rendered on the verdict. From this judgment appellants appeal and assign as error the overruling of their separate demurrers to each paragraph of the complaint, overruling the motion for judgment on the answers to the interrogatories and their motion for a new trial.

The gist of the first paragraph of the complaint is that on October 16, 1905, and prior thereto, the appellants were engaged in the practice of medicine and surgery, as 1. partners, in the town of Tipton, and held themselves out as competent and skilful physicians and surgeons; that on that day appellee, Mary L. Vernon, was five years of age, in good health and free from disease and injuries of any kind; that on said day she slipped and injured her right leg and ankle below the knee; that in the afternoon of October 17, 1905, appellants were called to treat the injured limb and undertook so to do; that they carelessly, negligent-

ly, unskilfully and ignorantly treated the limb, in this, that they and each of them carelessly, negligently and ignorantly failed and refused to make a proper diagnosis of the injury; that the bone of the leg near the ankle joint was split, which fact could have been easily and readily ascertained by the use of ordinary skill and care; that appellants failed to use ordinary care and skill and carelessly and negligently failed to learn the true condition of the limb and diagnosed the injury as a mere sprain and negligently failed to properly bandage and treat the limb; that appellants saw appellee a number of times prior to October 20, 1905, and she was at such times suffering severe pain in said limb and the same was very sore and greatly swollen, but notwithstanding said facts appellants carelessly, negligently and ignorantly failed to make a careful examination of the limb until October 20, 1905, and failed to use ordinary care to make an ordinary examination of the limb to ascertain the nature of the injury and the cause of appellee's suffering, all of which could have been easily done by ordinary diligence, care and skill in making an ordinary examination of appellee's limb and injuries; that by reason of the negligence, carelessness and ignorance of appellants and their failure to exercise ordinary care and skill in diagnosing the injury and treating the limb, the bone became diseased, blood poison set in and mortification began and the limb steadily grew worse and said condition spread over appellee's entire body; that by reason of the negligence and carelessness of appellants aforesaid, appellee became so diseased and affected that an operation was necessary to save her life, which operation took place on February 24, 1906; that a part of the bone between the knee and the foot was removed, the bone of her right shoulder had to be scraped and portions thereof removed; that her entire system was inoculated with septic poison and she was caused to suffer great pain and anguish of body and mind and is thereby permanently injured and crippled and will continue to

suffer the remainder of her life all on account of the aforesaid negligence and want of skill, care and proper treatment on the part of the appellants to appellee's damage in the sum of $25,000.

The general averments of the second paragraph of complaint are substantially the same as those of the first, but it is especially averred that appellants carelessly, negligently and ignorantly used ordinary gasoline to remove from appellee's limb an adhesive bandage or plaster; that the limb was swollen and badly inflamed and by the use of the gasoline and the negligent failure of the appellants to properly cleanse the same, the limb became sore, blistered and irritated to such an extent as to produce blood poison with the results aforesaid.

The third paragraph contains the same general allegations as the first paragraph and specially charges that on October 20, 1905, appellants carelessly, ignorantly, negligently and unskilfully placed the limb, which was then sore, swollen, tender and inflamed, in a plaster of Paris cast, and negligently made the same so tight as to greatly impede and stop circulation; that because of said treatment mortification set in and a septic condition and blood poisoning resulted, extending throughout her whole body; that appellee was thereby thrown into spasms; her temperature reached 106 degrees, and on October 21, 1905, the cast had to be removed; that thereafter as a result of such treatment, in order to save her life, appellee underwent a dangerous and painful operation which is described as in the other paragraphs.

The fourth paragraph charges negligence in failing to diagnose properly the case, and combines the specific averments of the second and third paragraphs as to the use of gasoline and the tight bandage.

The fifth paragraph contains the same general averments as the first. It charges a negligent failure to diagnose properly the case and also alleges a dislocation of the

right hip which caused pain in the lower limb, and alleges substantially the same general conditions and results as are charged in the other paragraphs.

The sixth paragraph charges a negligent failure to diagnose the injury which is alleged to have been a dislocation of the right hip. It also makes substantially the same averments as to the tight bandage and the use of gasoline as other paragraphs and charges that appellant scraped the blistered limb with finger nails and unclean and poisonous instruments which produced blood poison.

Each of the paragraphs states a cause of action.

The substance of the answers of the jury to the interrogatories as far as material to the questions presented is as follows: That appellee a girl six years of age was injured on the afternoon of Monday, October 16, 1905, and the following night and day complained of severe pain in her right ankle and foot; that appellant, McKee, was called to see her about 5 p.m. the next day and was informed by the mother of appellee that the child had fallen or had been struck on the ankle the day before and had been suffering severe pain in her limb; that she wanted to know whether there was a sprain or some other injury to the bone or joint; that said McKee did not make an examination of the foot and ankle at that time, but advised the mother to continue to make hot applications to the limb as she had been doing; that the mother called appellant, McKee, again on Wednesday evening the 18th, and he found appellee still suffering severe pain; that later, on the same evening, both appellants called to see appellee and made some examination of her foot and ankle and put on some adhesive strips; that appellant, McKee, called the next morning and learned that appellee had continued to suffer greatly and was still restless and suffering intensely; that her suffering continued through Thursday and Thursday night, and appellant, Longfellow, was again called in on Friday morning; that about 9 a.m. of the same day both appellants saw appellee; that it was at

that time the usual practice among physicians and surgeons to apply adhesive strips in order to place a joint or limb at rest; that on Friday appellants removed said adhesive strips from appellee's limb by applying gasoline and it was then the usual and customary practice of physicians and surgeons to use gasoline to loosen and remove such strips and it was considered proper practice among physicians and surgeons so to do; that after removing the strips water was used on the limb where the strips had been and appellee then was chloroformed and a plaster of Paris dressing was placed on her ankle and limb over a layer of medicated surgeon's cotton, held in place by a strip of gauze; that it was the usual and customary practice among physicians and surgeons to so encase an injured limb and in so doing appellants used the method ordinarily used by physicians and surgeons at that time; that though such dressing is properly applied to the ankle and foot, the toes and heel frequently become discolored; that if such dressing is placed too tight, the fact is indicated by the heel and toes becoming cold; that appellee continued to suffer intensely after said plaster of Paris cast was placed on her limb and at 11 o'clock Friday night she went into convulsions; that appellant, McKee, saw appellee Friday afternoon and at 11 o'clock that night and remained with her until Saturday morning, and gave her some treatment to ease her pain; that appellant, McKee, and Dr. Newcomer saw appellee on Saturday about twenty-four hours after the plaster of Paris cast was put on, and Dr. Newcomer cut open the cast; that if a tight dressing is continued too long around the ankle and foot and entirely stops circulation it will produce gangrene which will first appear in the toes; that gangrene did not exist in appellee's toes prior to the operation in February, 1906; that gangrene may be produced without blood poisoning accompanying the same; that gangrene is the death of portions of the body produced by cutting off the nourishment derived from the blood; that septicaemia, or blood poison, is

a pus infection of the blood and the pus is caused by a germ
without which poisoning does not occur; that a tight bandage
will not produce blood poison without first producing gan-
grene; that a tight bandage would "produce a condition
in which there was blood poison in twenty-four hours with-
out first producing gangrene"; that appellant, McKee, and
Dr. Dickey, visited appellee on Sunday morning and Dr.
Dickey saw her in the afternoon of said day; that Dr. New-
comer and Dr. Dickey visited appellee about seven p.m. on
Sunday and removed the plaster of Paris dressing; that
Dr. Newcomer then prescribed a flax seed poultice which
was used; that Dr. McKee and Dr. Dickey visited appellee
on Monday of the second week and Dr. McKee on Tuesday
following; that Dr. McKee visited appellee the last time on
Wednesday of the second week; that appellee had in her
ankle the disease known as osteo-myelitis, which is a disease
of the bone substance itself, in which pus is present in "the
bone and under the *periosteum*", and produces pain from
the beginning; that "the present condition" of appellee's
right ankle and foot was caused by the disease known as
osteo-myelitis; that the pain which existed in appellee's
ankle and limb before the adhesive strips and plaster of
Paris dressing were placed thereon by appellants was not
caused by the disease known as osteo-myelitis, which pain
at such time was due to a sprained ankle; that neither bone
of appellee's lower right limb was split or fractured at the
time she was treated by appellants. Interrogatory 101 and
the answer is as follows: "Do you find that the plaintiff's
right hip was not dislocated at any time when she was
treated by defendants, or either of them as set out in the
fifth and sixth paragraphs of complaint? Ans. No."

Appellants insist that the answers to the interrogatories
are in irreconciliable conflict with the general verdict; that
the answer that there was no split or fractured bone pre-
vents a recovery on the first paragraph of complaint and
that the answers in regard to the use of gasoline prevent a

recovery on the second paragraph; that the answers to the effect that it was customary and proper practice among physicians to use a plaster of Paris cast in such cases and that the methods used in putting the same on were those then ordinarily employed by physicians and surgeons in such cases, together with the answers in regard to gangrene and blood poison, bar a recovery on the third paragraph; that the fourth combines the averments of the second and third paragraphs and the same answers bar a recovery on that paragraph; that the answers show conclusively that appellee's injury was not a dislocated hip, and that her condition was not due to causes not alleged in either the fifth or sixth paragraphs of complaint, or in fact in any paragraph thereof, viz., "osteo-myelitis" and that this and the other facts found in regard to the injury and treatment make it certain there can be no recovery on either the fifth or sixth paragraphs of the complaint.

The rules of law applicable to a motion for judgment on answers to interrogatories, notwithstanding the general verdict, are not in dispute here and need not be repeated.

A physician or surgeon acting under a general employment does not undertake absolutely to cure his patient, but he is bound to possess and exercise the average degree of 2. professional learning and skill possessed and exercised by members of the medical profession in good standing practising in similar localities, at the time of any particular treatment or service. It is the duty of a physician or surgeon to use that reasonable care and diligence, ordinarily exercised by members of the profession in similar cases, under like conditions, and failure so to do constitutes negligence on his part. *Thomas* v. *Dabblemont* (1903), 31 Ind. App. 146, 150, 67 N. E. 463; *Baker* v. *Hancock* (1902), 29 Ind. App. 456, 460, 63 N. E. 323, 64 N. E. 38; 30 Cyc. 1570, *et seq.* If the want of such reasonable degree of 3. skill and learning ordinarily possessed by physicians and surgeons practising in similar localities at the

same time, or the negligence of the physician or surgeon, in diagnosing the case or treating his patient, is the proximate cause of injury to the patient, he is liable to answer in damages therefor.   In other words the implied obligation of the physician or surgeon to his patient is that no injurious consequences shall result to him from his want of proper learning, skill, care and diligence.   5 Thompson, Negligence §6711; 30 Cyc. 1575.   Failure to exercise the reasonable care and diligence required by the law may be predicated on things done that should not have been done, or on the negligent failure to do or cause to be done something that should have been done, in the particular instance.

Conceding, without deciding, that the answers are sufficient to prevent a recovery on the theory of the split or injured bone, or the negligent use of gasoline, as charged in the first and second paragraphs of the complaint, we come to the consideration of the answers relating to the allegations of the third paragraph, which in substance charge negligent treatment in placing on a badly swollen limb, a bandage, or plaster of Paris cast, so tight as to greatly impede and stop the circulation of the blood in the injured part of the limb, from which treatment blood poison resulted which extended to all parts of her body.   The interrogatories and answers relied on to defeat a recovery on the third paragraph are those which show that the use of a plaster of Paris cast, in such a case, was customary among physicians and surgeons at that time; that a tight bandage will produce gangrene; also those showing the cause and nature of gangrene and blood poison.   By the answer to interrogatory No. 76 the jury found that a tight bandage will not produce blood poison without first producing gangrene, and by the answer to interrogatory No. 77 it found that a tight bandage would produce a condition in which there was blood poison in twenty-four hours, without first producing a breaking down of the tissues known as

gangrene.  Appellants contend that these interrogatories are not contradictory, but we are not able to agree with such view and hold that they are antagonistic and nullify each other.

The complaint charges that the limb was badly swollen, sore and tender, and that the cast was negligently placed thereon so tight that by reason thereof, together with the condition, and negligent treatment of the limb, blood poison was produced, which extended throughout appellee's body and produced a condition that made an operation necessary, which operation revealed a diseased and injured condition of the bones of the leg and shoulder which it is alleged resulted from the tight cast and negligent treatment aforesaid.  The finding that the use of the plaster of Paris cast and the method of applying it, were proper, in this case, does not necessarily contradict the finding by the general verdict that appellants negligently applied to appellee's limb, when the same was tender and badly swollen, a bandage or cast so tight that blood poison and a diseased condition of the bones of her leg and shoulder resulted therefrom.  The general verdict includes a finding in appellee's favor of every material fact alleged, and in passing on the motion for judgment on the answers to the interrogatories we do not consider the evidence actually before the jury, but consider the verdict as supported by any legitimate and competent evidence possible under the issues.  When so considered we do not think the answers aforesaid overcome the general verdict as to the third paragraph of complaint.

But the jury also found that the disease of osteomyelitis is accompanied by severe pain from the beginning and that appellee's pain prior to the time the adhesive strips were placed on her limb by appellants, was not caused by that disease, but was due to a sprained ankle.  These facts, therefore, do not conclusively show that appellee had osteo-myelitis before she was treated

by appellants, but at least leave room for the inference that she did not. The jury by its general verdict found that appellee's condition was due to the causes alleged in the complaint, and the most favorable construction that can be given to the answers aforesaid is that appellee had osteo-myelitis after she was treated by appellants and that her pain prior to that time was due to other causes.

It is also argued that the finding of the jury that septicaemia, or blood poison, is a pus infection of the blood produced by a germ, contradicts the finding by the general verdict that blood poison was produced by the negligent treatment of appellee's limb as alleged in the third and other paragraphs of the complaint. The allegations of the third paragraph not only charge the negligent use of the tight cast, but a badly swollen and tender condition of the limb when the cast was applied, and that blood poison resulted from the treatment. The general finding was a legitimate inference from the evidence, within the issues, and the facts found by the answers to the interrogatories in regard to blood poison are not in irreconcilable conflict therewith, for they may be given full credit and yet blood poison may have resulted as alleged. Furthermore, in our opinion as above stated, the answers to the interrogatories are not in irreconcilable conflict with the general verdict, if based on either the fifth or sixth paragraph, which avers an injury to the hip and a negligent failure to diagnose or treat such injury. The answer to interrogatory 101, simply affirms that the jury does not find that the right hip was not dislocated, which is not contradictory of or inconsistent with the general verdict which finds that it was dislocated.

Appellants' contention is that the finding that appellee's "present condition" is due to the disease of osteo-myelitis necessarily shows it could not be due to the causes alleged in these paragraphs, but such conclusion can not be sustained when we view the general verdict as supported by any

legitimate evidence possible under the issues. Furthermore, the complaint in several paragraphs, alleges negligence in failing to use ordinary skill and diligence in diagnosing appellee's case. A recovery may be had for negligence in this respect as well as for any other failure to measure up to the standard of the law in professional skill and diligence. The answers of the jury to the interrogatories are not in irreconcilable conflict with the general verdict on the issues of negligent diagnosis.

11.

The conclusions already announced make it unnecessary to consider in detail the other questions argued by counsel on the motion for judgment on the answers to the interrogatories.

Under the motion for a new trial, appellants' learned counsel ably contend that the verdict of the jury is not sustained by sufficient evidence; that there is a total lack of competent evidence to prove the material averments of the complaint with reference to the alleged malpractice; that the verdict of the jury is therefore nothing more than a guess, or the result of inferences drawn from other inferences. This contention of appellants is based upon the proposition that there is no evidence of a physician or surgeon, or person competent to give testimony, to prove that anything was done that should not have been done, or that anything was left undone that should have been done, or that anything was negligently done by appellants in this case to the injury of appellee, when measured by the standard of law, applicable to the case.

12.

It is not disputed that there is evidence to support the general averments of the complaint as to the employment of appellants, the history of the trouble and the rendition of the services substantially as alleged, but dispute arises as to the want of skill and diligence in diagnosing and treating the case. There was testimony to prove that appellee suffered great pain both before and after appellants began

to treat her; that her suffering increased after the bandages and cast were placed on her limb; that the bandages made deep creases in the flesh which was blistered and became infected and discharged pus; that appellants ordered all wrapping or cloth used on the limb burned; that after the cast was placed on the limb, the toes and heel became greatly swollen and discolored; that appellee screamed when her hip was touched and her foot and hip turned outward and lay flat on the bed when she was lying on her back; that appellants used gasoline to remove the adhesive strips from around the limb and let the gasoline run down into a basin of water in which the patient's foot was placed; that they used the same water from this basin to wash the limb after removing the tight strips, and scraped the limb with the finger nails and with a match; that they then said they had concluded the bone was split and they would have to put the limb in a cast; that they chloroformed appellee and put a plaster of Paris cast on the limb on Friday, October 20, and made the bandage very tight; that appellee thereafter grew rapidly worse, her fever rose, she complained that the bandage hurt her and Dr. McKee was called back later in the day; that his attention was called to the tight cast and he was asked if that was not the cause of the patient growing worse, but he did not examine it to ascertain the condition of the foot and limb; that the toes and heel continued to swell and became dark purple in color; that at nine o'clock that night appellee became delirious and went into convulsions and at 11 o'clock p.m. Dr. McKee said her temperature was $106\frac{4}{5}$ degrees and she could not last long; that he gave her a hypodermic injection to ease her pain; that on Saturday morning Dr. Newcomer was called at the suggestion of appellee's parents; that he uncovered the limb, tapped on the toes with his fingers and told Dr. McKee the cast was too tight and immediately opened it with a lance; that Dr. Dickey and Dr. McKee saw her on Sunday morning and Dr. Dickey said she had blood poison; that Dr. New-

comer removed the cast on Sunday evening and there were
blisters around the ankle as large as a quarter and he di-
rected appellee's mother to burn everything for it was septic;
that on Monday morning there was blood on the poultice
and Dr. McKee said burn it for it was septic; that Dr.
Dickey asked Dr. McKee in the hearing of lay witnesses,
what he thought brought on the blood poison and he said
he did not know; that Dr. Dickey then asked him what he
used to take off the adhesive strips and Dr. McKee said
gasoline, whereupon Dr. Dickey asked him if he washed it
thoroughly and he said he thought he did; that Dr. Dickey
then said to him that blood poison might have come from
that but "I believe you got your cast too tight and that
caused it"; that thereafter pus ran from the sores on the
limb and foot, and a sore came near the collar bone and one
on the head, and some at the ankle had to be lanced; that
her shoulders, head and face swelled greatly, her right arm
became stiff, drainage tubes had to be used in parts of her
limb and pus continued to run for ten or twelve weeks.

Mrs. Nichols, a trained nurse who saw appellee several
times and assisted the doctors in dressing the limb, testi-
fied that appellee complained of her hip at the joint, and
would cry whenever it was touched; that she had experience
nursing patients afflicted with blood poison and it looked to
her as if appellee had blood poison.

Dr. Reagan testified that if the circulation is stopped or
greatly impeded, an inflammatory condition results which
is termed septicaemia or blood poison; that a bandage around
the limb below the knee tight enough to stop the flow of
blood through the veins would develop septicaemia, which
might appear in from twenty-four to forty-eight hours;
that the carbonic acid gas in the tissues, if confined by a
tight bandage, will produce blood poison, and that such
poison thus produced in the soft tissues of the body might
affect the bone, first attacking the periosteum and afterwards
the bone itself; that the disease osteo-myelitis is not difficult

to diagnose and he did not consider it proper treatment for that disease to encase the limb in a plaster of Paris cast. In answer to a hypothetical question covering the facts of the case as appellee claimed to have proven them, the witness answered that in his opinion a tight bandage and such treatment would produce a condition that would result in blood poison.

Dr. Ricketts testified to substantially the same effect. He also testified that a plaster cast should be watched closely to see that it is not too tight, and that in a case like this he would give close attention to the extremities.

Dr. Wright testified that a bandage around the limb tight enough to stop the return of the blood will produce either gangrene or blood poison in a few hours or in a few days, depending on the pressure and the condition of the limb. His answer to the hypothetical question showed that in his opinion it was a case of blood poison; that blisters and discharge are indicative of septic poison and it may affect the periosteum and the bone. He also testified that he had made an X-ray examination of appellee's hip some time after the treatment complained of in this case and found a dislocation of the hip. Dr. McKee also testified that under some circumstances a tight bandage or cast might produce blood poison.

From this testimony it appears that lay witnesses testified that while waiting on appellee the attending physicians said she had blood poison and that it was produced by a tight cast or other treatment of appellants; that medical witnesses in answer to hypothetical questions based upon the facts appellee claimed to have proven, testified that blood poison might be produced by the treatment appellants gave appellee and that from such blood poison the periosteum and bone itself might thereafter be affected; that in their opinion, based on such facts, appellee had blood poison. There was also medical testimony to show that a plaster of Paris cast should be carefully watched to see that it was not or

did not become, too tight; that such cast was not proper treatment for osteo-myelitis.

There are questions requiring scientific or expert knowledge which can only be answered by those possessing the requisite skill and knowledge to give their answers

13. probative value, and persons not so qualified are not therefore competent witnesses as to questions depending wholly on such scientific or expert knowledge.

14. 5 Ency. Evidence 517, et seq.; Isenhour v. State (1901), 157 Ind. 517, 528, 62 N. E. 40, 87 Am. St. 228. Whether the treatment of any particular injury or case was proper, or whether a surgical operation was skilfully performed, or whether a particular disease resulted from alleged negligent treatment, and like questions of science, must of necessity depend upon the testimony of physicians and surgeons learned in such matters, but such questions are not identical with the ultimate issue to be decided by the jury. Wharton v. Warner (1913), 75 Wash. 470, 135 Pac. 235, 237; 9 Ency. Evidence 840-846; Hoener v. Koch (1877), 84 Ill. 408. The foregoing rule does not have the effect of limiting or prescribing the testimony of nonexpert witnesses as to particular facts within their knowledge, which may bear upon questions depending for their ultimate solution upon scientific knowledge. In

15. a malpractice suit, facts relating to the treatment and the condition of the patient may be stated by such witnesses, though they may be incompetent to give an opinion as to the value or effect of such facts from a medical or surgical point of view. Hitchcock v. Burgett (1878), 38 Mich. 501, 505; Piles v. Hughes (1860), 10 Iowa 579, 580.

When facts having some testimony to prove them are stated hypothetically to a witness having the requisite scientific knowledge to form and express an opinion there-

16. on, and he gives his expert opinion based thereon, such evidence is to be considered by the jury along with other testimony in the case, and should be given such

weight as the jury, under proper instructions from the court, may deem it to merit. The fact that all or a part of the statements in such hypothetical question may depend entirely for proof upon the evidence of the nonexpert witnesses who have testified to them, will not deprive such testimony of probative value, but the expert testimony based thereon will be weighed and considered by the rules governing the weight of such testimony generally, and if a fact supported by such proof be found by the jury, it can not be said to be the result of a mere guess, or to be wholly unsupported by evidence. *Bower* v. *Self* (1904), 68 Kan. 825, 75 Pac. 1021; *Harris* v. *Fall* (1910), 177 Fed. 79, 100 C. C. A. 497, 27 L. R. A. (N. S.) 1174, 1179; *Williams* v. *Nally* (1898), 20 Ky. L. R. 244, 246, 45 S. W. 874; *Wood* v. *Wyeth* (1905), 106 App. Div. 21, 94 N. Y. Supp. 360, 363; *Rowe* v. *Lent* (1891), 42 N. Y. St. 483, 485; *Wharton* v. *Warner, supra; Olmsted & Bailey* v. *Gere* (1882), 100 Pa. St. 127; 9 Ency. Evidence 846. In *Williams* v. *Nally, supra,* the supreme court of Kentucky said: ''The testimony of those not professing to be experts with respect to the actual condition of appellee's leg was competent because they only spoke of what they saw and knew. They expressed no opinions.''

The facts in some cases may be of such a character as to enable the jury to find negligence in the treatment of a patient without the aid of expert testimony. *Wharton* v. *Warner, supra,* 237; *Harris* v. *Fall, supra.* In the case at bar the issues present the question of appellants' want of professional skill and learning, and likewise that of negligence in failing to exercise ordinary, or reasonable care and diligence in diagnosing and treating appellee's injury or disease. In such case all the facts and circumstances of the treatment, the condition and conduct of the patient, the acts and conduct of the physicians, their omissions, if any, and any other facts that may throw light upon the questions at issue are proper matters

of evidence to be given by any competent witness, either to support or negative the charge of malpractice. 9 Ency. Evidence 841, et seq.; Link v. Sheldon (1892), 136 N. Y. 1, 32 N. E. 696; Mertz v. Detweiler (1845), 8 W. & S. (Pa.) 376.

The question of negligence, or failure to exercise ordinary skill and care in the treatment of any particular case, does not depend upon the professional skill and learning of the physician, but is to be determined from a consideration of his acts, conduct, omissions, and treatment in the particular instance. If he possessed the highest degree of skill and learning in his profession and failed to exercise the care and diligence required by the law in treating his patient, his skill and learning could not shield him from the consequences of such negligent treatment. On the other hand, if he did not possess the skill and learning required by the legal standard, but his treatment in the particular instance was proper, he could not be held liable for the want of such skill which resulted in no injury to the patient. Butte v. Potts (1888), 76 Cal. 304, 18 Pac. 329; Holtzman v. Hoy (1886), 118 Ill. 534, 8 N. E. 832, 59 Am. Rep. 390.

We have examined the questions presented in relation to the evidence and instructions given and refused and find no reversible error. While there may be ground for some criticism of the instructions, we are sure the inaccuracies or repetitions complained of, did not harm appellants. The instructions given fairly and accurately state the law applicable to the case and cover all the essentials of those tendered so as to make it reasonably certain appellants were not harmed by the refusal of the court to give any of those tendered by appellants. The evidence was sufficient to warrant the jury in returning the verdict against appellants and we can not say it is the result of a guess or that it is wholly unsupported by the evidence. There is evidence warranting the finding, or inference, of every fact, essential to the support of the

verdict, without resorting to the drawing of inferences from other inferences as appellants contend must have been done to render a verdict against them. We find no reversible error in the record. Judgment affirmed.

· Note.—Reported in 105 N. E. 178. As to liability of physicians and surgeons for negligence and malpractice, see 48 Am. Dec. 481; 93 Am. St. 657. As to the liability of a physician or surgeon for failure to diagnose fracture or dislocation, see 28 L. R. A. (N. S.) 136. As to care and skill required of physicians and surgeons, see 37 L. R. A. 830; 1 Ann. Cas. 21,306; 14 Ann. Cas. 605.