Laura S. KILLEBREW and Edward D. Killebrew, Plaintiffs-Appellants,

v.

Frank JOHNSON, Jr., M.D., Defendant-Appellee.

No. 2–677A223.

Court of Appeals of Indiana, Fourth District.

June 2, 1980.

Robert W. McNevin and Roy F. Spilker, Marshall E. Williams, Indianapolis, for plaintiffs-appellants.

John P. Price, Robert G. Weddell and William G. Bruner, III, Bingham, Summers, Welsh & Spilman, Indianapolis, for defendant-appellee.

MILLER, Presiding Judge.

Laura and Edward Killebrew, husband and wife, filed a complaint in the Superior Court of Marion County to recover damages from Dr. Frank Johnson on a theory of medical malpractice. The Killebrews alleged that Dr. Johnson failed to exercise due care by failing to inform himself of the results of X-rays he ordered taken to determine the possible location of a Dalkon Shield, an intrauterine contraceptive device, (IUD) placed in Laura. At the close of all the evidence the motion for judgment on the evidence was granted Dr. Johnson. The Killebrews appeal. We reverse.

FACTS :

■ In reviewing a judgment on the evidence (directed verdict) the non-moving party, here the Killebrews, are entitled to the benefit of all favorable evidence and reasonable inferences drawn therefrom. *Gilbert v. Stone City Construction Co., Inc.*, (1976) Ind.App., 357 N.E.2d 738. We relay the facts accordingly.

Dr. Johnson was engaged in the practice of medicine in Marion County, Indiana, his speciality being obstetrics and gynecology. In the course of such practice Laura Killebrew was his patient. After he delivered her third child in February, 1973, he inserted an IUD. The following April she returned to him for an examination. Dr. Johnson was unable to manually locate the IUD and ordered X-rays to be taken. Based on the X-ray reports he informed Laura the IUD was properly located.

In September, 1973, Dr. Johnson confirmed that Laura was again pregnant. It was agreed he would remove the IUD and perform an abortion and a tubal ligation. Surgery was performed on September 25, 1973; however, during surgery he was not able to locate the IUD. He ordered X-rays immediately after surgery which were taken by the hospital radiologist. Later that day Laura spoke with Dr. Johnson and asked about the location of the IUD. He told her it was gone and not to worry. Shortly thereafter Laura was released from the hospital.

In October, 1973, Laura called Dr. Johnson complaining of pain and discomfort for which he prescribed medication. In No-

vember, 1973, Laura returned to his office for an examination. For the next two years Laura continued to complain of pain and discomfort and during this time she was unable to continue working and forced to quit her job. Being unable to pay the fees Dr. Johnson charged, she received treatment from both the Citizens Ambulatory Health Care Center and from the emergency room at Community Hospital.

Finally on August 2, 1975, complaining of extreme pain, she was admitted to Indiana University Hospital again under the care of Dr. Johnson. X-rays were ordered and taken immediately. An assisting resident, Dr. Soper, read these X-rays and the X-rays taken two years earlier on September 25, 1973. When Laura was examined by both Dr. Soper and Dr. Johnson, Dr. Soper revealed "she got the nineteen seventy-three X-rays mixed up with the nineteen seventy-five X-ray . . . because on both of them there was an IUD." Evidence is undisputed that both X-rays revealed the IUD to be in her peritoneal (abdominal) cavity. The next day Dr. Johnson performed surgery and successfully removed the IUD and, thereafter, Laura healed and progressed well.

The Killebrews filed their malpractice action on September 11, 1975, and the matter was set for jury trial. At the conclusion of their evidence and again at the conclusion of all the evidence Dr. Johnson filed the following motion:

"Comes now the defendant,. Frank Johnson, Jr., M.D., by counsel, and pursuant to Indiana Trial Rule 50, moves the court for a judgment on the evidence of the defendant.

"As grounds for the allowance of such motion, defendant says that:

"1. No evidence has been offered or received which raises a jury issue on the allegations of negligence (medical malpractice) against this defendant contained in plaintiffs' complaint.

"2. No expert testimony or expert evidence has been offered or received which sets out the required standard of care.

"3. No expert testimony or expert evidence has been offered or received which tends to prove negligence (medical malpractice).

"4. No expert testimony or expert evidence has been offered or received which tends to prove proximate cause.

"5. The plaintiffs have wholly failed to prove a prima facie case of medical malpractice.

"WHEREFORE, defendant, Frank Johnson, Jr., M.D., respectfully moves that this Court grant a judgment on the evidence for the defendant."

This motion was granted at the close of all the evidence.

*ISSUES*:

■ Since Dr. Johnson was granted a directed verdict the issue on appeal is whether there was sufficient evidence presented to establish a prima facie case of medical malpractice, or, in other words, whether there was sufficient evidence of 1) a standard of care, 2) breach of that standard and 3) proximate cause, *Long v. Johnson*, (1978) Ind.App., 381 N.E.2d 93, 100. The Killebrews maintain there was such evidence established by medical experts, or, in the alternative, no expert evidence was necessary at least as to the element of breach of the standard of care.

Dr. Johnson contends the standard of care was not established in that it was not his duty to read the X-ray report, rather it was the duty of the radiologist to inform him of any abnormalities. Thus, he insists he is not liable for the conduct of the hospital radiologist. Secondly, he contends there was no evidence that had the IUD been discovered in 1973 it would have been removed at that time or any time before the 1975 surgery. (We note these specific defenses were not enunciated in Dr. Johnson's rather general motion for directed verdict.)

*DECISION*:

We agree with the Killebrews that they established a prima facie case of negligence.

I. Standard of Care and Breach

Dr. Johnson contends there was not sufficient expert medical testimony to establish

his standard of care. The particular act the Killebrews contend is negligence on Dr. Johnson's part is his failure to inform himself of the results of the X-rays ordered and taken on September 23, 1973. To establish the necessary standard of care in this situation Dr. Joseph Thompson, the Killebrews' expert medical witness, testified as follows:

"Q. Assume as a fact that at the point the physician does not know where the Dalcon [sic] Shield is at the time of the dialtion [sic] and currettage, and the thereputic [sic] abortion. And assume that following that the physician has not found the Dalcon [sic] Shield. Now, under those circumstances, what would the standard of care and practice in the community be at that time?

"A. If at the time of the pregnancy termination, the Dalcon [sic] Shield is not found and the physician is fairly sure that he's explored the uterus, he would have to assume it's up in the peritineal [sic] cavity.

"Q. Alright, and assume, for example, that the Dalcon [sic] Shield was not found. What, if anything would be the standard and care and practice at that time with respect to taking x-rays to determine the location of the Dalcon [sic] Shield.

"A. The physician would order and [sic] x-ray to see if the IUD is in the peritineal [sic] cavity.

"Q. The doctor would have to know what the x-ray showed?

"A. Yes. If the x-ray did not show the IUD, the physician would inform the patient that the IUD is not in the peritineal [sic] cavity and it was probably expelled. And is no longer a problem. If the IUD were seen on the x-ray, the physician would have to inform the patient that she has an IUD in her peritineal [sic] cavity.

"Q. But he would have to look at the x-ray to make that determination?

"A. Or read the x-ray report."

The impact of this testimony is clear. It established Dr. Johnson's duty, upon being unable to locate the IUD, to order an X-ray "to see if the IUD is in the peritineal [sic] cavity". Further, he would have to personally examine the X-rays or X-ray reports to determine its location and relay that information to the patient.[1] In addition, Dr. Johnson acknowledged in his testimony that he did not inform himself of the contents of the X-ray or the X-ray reports until Laura was admitted into the hospital in 1975. Clearly the jury had before it evidence of the applicable standard of care and Dr. Johnson's breach thereof.[2]

1. Dr. Thompson's testimony on this point also disposes of Dr. Johnson's contention that it was the duty of the radiologist to inform him of any abnormal revelation in the X-rays, and thus liability rests on the radiologist. The testimony supports a conclusion that Dr. Johnson was negligent in not informing himself of the contents of the X-rays taken to discover the location of a foreign object in his patient's body, the specific object of his employment. We express no opinion with respect to the radiologist's possible negligence but note that, if it could be established, it was not necessary for the Killebrews to do so. It was sufficient for the Killebrews here to overcome the motion for judgment on the evidence by establishing 1) Dr. Johnson's negligence in failing to inform himself of the results of the X-rays and 2) that said negligence was a proximate cause of Laura's injuries. It was not necessary to prove his negligence was the sole proximate cause. *Long v. Johnson, supra,* at 101 of 381 N.E.2d

(citing *Meadowlark Farms v. Warken,* (1978) Ind.App., 376 N.E.2d 122).

2. We note here that there are medical malpractice cases in Indiana which have held that *no* expert testimony is required on some issues where negligence is inferable through *res ipsa loquitur, Klinger v. Caylor,* (1971) 148 Ind.App. 508, 267 N.E.2d 848; *Funk v. Bonham,* (1932) 204 Ind. 170, 183 N.E. 312, or where the negligence could be apparent to even a layman, *Shirey v. Schlemmer,* (1967) 140 Ind.App. 621, 223 N.E.2d 759, reversed on other grounds 249 Ind. 1, 230 N.E.2d 534; *Walker Hospital v. Pulley,* (1920) 74 Ind.App. 659, 127 N.E. 559; *Longfellow v. Vernon,* (1914) 57 Ind.App. 611, 105 N.E. 178; *see Ciesiolka v. Selby,* (1970) 147 Ind.App. 396, 261 N.E.2d 95. Here, with respect to Dr. Johnson's failure to inform himself of the contents of the X-rays or X-ray report, consideration of these exceptions is unnecessary to Dr. Thompson's testimony in which he established the standard of care.

## II. Proximate Cause

Dr. Johnson next contends the court's ruling was correct in any event since the Killebrews failed to establish the existence of proximate cause. He states there was no evidence the IUD would have been removed sooner if Laura had known of its migration.

Again Dr. Thompson provided the necessary evidence to establish proximate cause. Dr. Thompson was asked the following hypothetical question:

"I'm going to ask you again, doctor to assume all previous facts given to you and if you will, assume that following the office visit on November seven (7), nineteen seventy-three (1973) and throughout the remaining period of nineteen seventy three (1973), the female patient experiences pain in the abdominal cavity, pain the low back; periods of dizziness, spots before the eyes, headaches. And these conditions generally continue on an increasing rate throughout the year of nineteen seventy-four (1974) and into nineteen seventy-five (1975). And in nineteen seventy-five (1975) there is a point reached where the patient is having increasing difficulty with urination on a frequent basis and that particular pain along with the others continues to increase in intensity up to on or about August fourth (4th) nineteen seventy-five (1975), at which time there is surgical proceedings [sic] performed and an IUD is found located on top of her bladder. The IUD is then removed and that following such surgery the female patient no longer experiences any of the complaints or symptoms that I have incorporated in my hypothetical question. I'll ask you, doctor, whether or not under those circumstances and assuming those facts as true, whether or not you may have an opinion as to what cause if any may be attached to the symptoms and pain that I conveyed to you in my hypothetical question. If you have an opinion as to what caused it?"

To which he answered:

"It is generally assumed that symptoms that disappear following a surgical proceedure [sic] designed to correct a certain abnormal situation that these symptoms if logically associated with the proceedure [sic] and the removal or correction of a problem are caused by the problem that was corrected."

Although his answer is capable of misconstruction, we believe, in the context of this case, the jury could have reasonably inferred therefrom that the abdominal pain and discomfort suffered for the two year period prior to the operation and which disappeared thereafter was caused by the condition, the presence of the IUD in the peritoneal cavity, which the operation alleviated. See *Ciesiolka v. Selby, supra.*

Dr. Johnson's sole argument directed to proximate cause and as noted earlier was that Laura might not have consented to the removal of the IUD in 1973 even had she been informed of its location. We view this argument to be one in mitigation of damages rather than one relating to proximate cause. But even assuming arguendo that all of her pain and suffering until the curative operation might have been found by the jury to have been due to her refusal to submit to an operation, we think there was strong and convincing evidence that, in fact, she would have consented to the 1973 operation. Thus the issue was one for the jury to resolve and could not support the grant of a judgment on the evidence in favor of Dr. Johnson. In this regard, we note Laura consented to the removal of the IUD before the 1973 operation and immediately consented to its removal in 1975 upon discovering its location. In addition, Dr. Thompson testified that a doctor would probably have recommended the surgical removal of the IUD in 1973 where the patient exhibited symptoms similar to Laura's and, further, that the 1975 operation was about the same as the one which would have been performed in 1973.

Based on the foregoing the Killebrews are entitled to a new trial. The cause is reversed and remanded to the trial court.

CHIPMAN, J., and SHIELDS, J. (by designation), concur.