**Carl B. CENTMAN and Jane Centman, Appellants–Plaintiffs,**

v.

**Melinda A. COBB, M.D., Kathryn A. Garner, M.D., St. Vincent Hospital and Health Care Center, Appellees–Defendants.**

No. 73A01–9109–CV–262.

Court of Appeals of Indiana, First District.

Dec. 2, 1991.

Morris L. Klapper, Klapper Isaac & Parish, Indianapolis, for appellants-plaintiffs.

David J. Mallon, Jr., Ice Miller Donadio & Ryan and N. Kent Smith, Hall, Render, Killian, Heath & Lyman, Indianapolis, for appellees-defendants.

ROBERTSON, Judge.

Carl B. and Jane Centman (the Centmans) appeal from a preliminary determination of law by which the trial court determined that Drs. Melinda A. Cobb and Kathryn A. Garner, who were recent graduates from medical school in postgraduate training and holders of temporary medical permits, should be "required to possess such skill and use such care as other capable medical college graduates serving in the first year of postgraduate medical training ordinarily possess and use under similar circumstances in the same or similar localities." On appeal, the Centmans claim the proper standard of care for such persons is the same as that for physicians with unlimited licenses to practice medicine in Indiana. We reverse.

Drs. Cobb and Garner graduated from medical school in April of 1988, and each obtained a temporary medical permit on July 1, 1988. Dr. Cobb then began a residency in psychiatry, and Dr. Garner began a residency in obstetrics and gynecology. Such a first-year resident is described as an intern and is not yet eligible for an unlimited license to practice medicine. Instead, the intern obtains a temporary medical per-

mit and uses it to complete the one year of practical experience required to obtain an unlimited license to practice medicine.

On September 20, 1988, Drs. Cobb and Garner performed their respective residencies at St. Vincent Hospital in Indianapolis. On that day, Carl Centman arrived at the emergency room, and Drs. Cobb and Garner treated him that evening and the following day. Carl Centman received lithium during this treatment. On September 21, 1988, Dr. Cobb ordered additional lithium be administered to him. The Centmans allege this administration of additional lithium constituted negligence because Carl had already exhibited signs of lithium poisoning. They also allege Carl experienced seizures and then coded. They claim he has suffered severe neurological damage as a result.

The Centmans commenced this action under the Indiana Medical Malpractice Act, Ind.Code 16–9.5. The parties tendered submissions of evidence to a medical review panel; but, before the panel rendered a decision, a question arose about the standard of care Drs. Cobb and Garner were required to exercise with respect to their patients. The Centmans therefore filed a Motion for Preliminary Determination of Law in the trial court, which ruled that:

> in rendering medical care to plaintiff Carl B. Centman, Defendant [sic] Melinda A. Cobb, M.D. and Kathryn A. Garner, M.D. were required to possess such skill and use such care as other capable medical college graduates serving in the first year of postgraduate medical training ordinarily possess and use under similar circumstances in the same or similar localities.

Neither Dr. Cobb nor Dr. Garner qualified as a "physician" under the Medical Malpractice Act because each held a temporary medical permit and not an unlimited license to practice medicine. I.C. 16–9.5–1–1(b). This does not mean, however, that they are not subject to the Act. Drs. Cobb and Garner were employees or agents of St. Vincent Hospital, acting in the course and scope of their employment, when the alleged malpractice occurred. They there-

fore fall within the definition of "health care provider" as provided by the Medical Malpractice Act. I.C. 16–9.5–1–1(a)(1).

Indiana Code Title 25, Article 22.5, governs professions and occupations of physicians. Definitions for that article are provided in I.C. 25–22.5–1–1.1. "Physician" means any person who holds the degree of doctor of medicine or doctor of osteopathy or its equivalent and who holds a valid unlimited license to practice medicine or osteopathic medicine in Indiana. I.C. 25–22.5–1–1.1(b). The doctors here likewise do not fall within the definition of "physician" under this statute; however, this statute governs their conduct because that conduct falls within the definition of the practice of medicine. The "practice of medicine or osteopathic medicine" includes holding oneself out to the public as being engaged in the diagnosis, treatment, correction, or prevention of any disease, ailment, defect, injury, infirmity, deformity, pain, or other condition of human beings or the suggestion, recommendation or prescription or administration of any form of treatment, without limitation. I.C. 25–22.5–1–1.1(a)(1)(A) and (B).

Dr. Cobb cites *Watson v. Medical Emergency Services* (1989), Ind.App., 532 N.E.2d 1191, *trans. denied,* in support of her position on this issue. She contends that, in a typical medical malpractice action, the duty required of a defendant physician is to exercise that degree of skill and care which is ordinarily possessed and used by *physicians* in similar fields or specialties, in the same or similar locality. Neither doctor here is a "physician" either under the Medical Malpractice Act or under the Professions and Occupations of Physicians statutes. Each therefore claims she should be held to a standard of care required of interns or first-year residents instead of that required of a fully licensed physician.

True enough, *Watson* used the term *physician* when it addressed the standard of care. In that case, however, the doctor's status as a physician with an unlimited license to practice medicine was not in dispute. The doctor was a physician within the scope of the standard of care and also

within the Medical Malpractice Act and the Professions and Occupations of Physicians statutes. The term physician, and nothing less, applied to the doctor in that case; and the use of that term in the text of the case is therefore understandable. In the present case, Drs. Cobb and Garner are not "physicians" within the scope of either set of statutes, but their conduct is nevertheless governed by both sets of statutes. Their conduct is included in the Medical Malpractice Act because, as noted above, each is a health care provider. Their conduct is also included in the Professions and Occupations of Physicians statutes because each was engaged in the practice of medicine.

The definitions of "physician" in the statutes are limited to the statutes. I.C. 16–9.5–1–1; I.C. 25–22.5–1–1.1. The standard of care, however, is the yardstick by which we measure the medical practitioner's conduct to determine if it is negligent. *See Watson*, 532 N.E.2d at 1193; *Longfellow v. Vernon* (1914), 57 Ind.App. 611, 105 N.E. 178. The standard of care is not established by these pieces of legislation but by the courts as a matter of public policy, and the use of the term *physician* in the applicable standard of care therefore is certainly not limited to the definition of "physician" in the statutes.

We conclude that *physician,* as applied in the standard of care, means a practitioner of medicine. Indeed, this Court has used the following language:

> The measure of the duty of a *general practitioner* is that he does not undertake absolutely to cure, but is bound to possess and exercise the average degree of skill possessed and exercised by *members of the profession practicing* in similar localities ...

*Baker v. Hancock* (1902), 29 Ind.App. 456, 460, 63 N.E. 323, 324, *reh. denied,* 29 Ind. App. 456, 64 N.E. 38, *trans. denied* (emphasis supplied).

 We therefore turn to the determination of whether a postgraduate intern or first-year resident is a physician within the scope of the standard of care so that Drs. Cobb and Garner, who held temporary medical permits, were required to exercise that degree of skill and care which is ordinarily possessed and used by fully licensed physicians in similar fields or specialties and in the same or similar locality. We conclude that such an intern is a practitioner of medicine required to exercise the same standard of skill as a physician with an unlimited license to practice medicine.

 In the absence of special contract, the physician or surgeon who assumes to treat and care for a patient impliedly contracts that she has the reasonable and ordinary qualifications of her profession and that she will exercise reasonable skill, diligence, and care in treating the patient. *Worster v. Caylor* (1953), 231 Ind. 625, 110 N.E.2d 337, *overruled on other grounds (see Wilson v. Sligar* (1987), Ind.App., 516 N.E.2d 1099). None of the parties have claimed such a special contract exists, so this does not relieve Drs. Cobb and Garner of the physician's standard of care.

As noted, Drs. Cobb and Garner held valid temporary medical permits. Such permits are authorized by I.C. 25–22.5–5–4. According to 844 Indiana Administrative Code 4–4.1–2(b), temporary medical permits, for the purpose of obtaining postgraduate medical education or training, including *internship,* transitional program, *residency training,* or other postgraduate medical education, in an approved medical institution or hospital located in Indiana, may be issued to persons who have completed the academic requirements for the degree of doctor of medicine from an approved medical school (emphasis supplied). Such permits remain in force and effect for a period of one (1) year and may be reissued for additional one (1) year periods in the discretion of the medical licensing board. In addition, the temporary medical permits issued under this subsection shall limit the applicant's *practice of medicine* to the postgraduate medical education or training program in an approved medical education institution or hospital in which the applicant is employed, assigned, or enrolled, which limitation shall be stated on the face of the temporary medical permit (emphasis supplied). Persons issued a tem-

porary medical permit shall not accept, receive, or otherwise be employed or engaged in any employment as a physician unless approved by, or otherwise made a part or adjunct of, the applicant's postgraduate medical education or training program.

The term "practitioner" includes a person who holds an unlimited license to practice medicine or a *limited license or permit* as may be issued by the medical licensing board. 844 I.A.C. 5–1–1(b) (emphasis supplied). A temporary medical permit is such a limited permit, and Drs. Cobb and Garner were therefore "practitioners." Such persons shall exercise reasonable care and diligence in the treatment of patients based upon generally accepted scientific principles, methods, treatments, and current professional theory and practice. 844 I.A.C. 5–1–2(d).

In addition, our supreme court has cited the *Cyclopedia of Law and Procedure* with favor:

"The word 'physician' is defined to mean a person who has received the degree of doctor of medicine from an incorporated institution; one lawfully engaged in the practice of medicine."

*William Laurie Co. v. McCullough* (1910), 174 Ind. 477, 488, 90 N.E. 1014, 1018 (citing 30 Cyc. 1544). *See also, Witty v. State* (1910), 173 Ind. 404, 90 N.E. 627 (term "doctor," in one respect, means a person who practices medicine).

Drs. Cobb and Garner have each received a degree of doctor of medicine from an incorporated institution: Indiana University. We further note that Drs. Cobb and Garner practiced medicine, but they did not commit unlawful or unauthorized practice of medicine. As interns or residents in a hospital under the supervision of the hospital's staff, they are excluded from I.C. 25–22.5, as it relates to the unlawful or unauthorized practice of medicine. Each was, in fact, engaged in the lawful and authorized practice of medicine under a temporary medical permit.

Drs. Cobb and Garner held themselves out as doctors to members of the public who were patients they treated at St. Vincent Hospital. They called themselves doctors, *see* I.C. 25–22.5–1–1.1(a)(3); and St. Vincent Hospital referred to them as doctors. They were graduates of medical school and continued their studies under temporary medical permits. They treated Carl Centman and prescribed medication for him. In short, they practiced medicine as a employees or agents of St. Vincent Hospital. They made no representation to the Centmans that they possessed less skill or knowledge than that normally possessed by practitioners of medicine, and the Centmans were entitled to rely on their representations that they were doctors as admissions they would be held to the standards of any other practitioner of medicine. Regardless of whether Drs. Cobb and Garner were also called interns or first-year residents, they were practitioners of medicine required to exercise the same standard of care applicable to physicians with unlimited licenses to practice. *See McBride v. United States* (9th Cir.1972), 462 F.2d 72. *See also, Eureka–Maryland Assurance Co. v. Gray* (1941), 74 App.D.C. 191, 121 F.2d 104, *cert. denied*, 314 U.S. 613, 62 S.Ct. 114, 86 L.Ed. 494 (intern is a physician, a graduate of a medical school with a doctor's degree, though may not be licensed to practice profession in the ordinary way by holding self out to public); *Gonzalez v. United States* (W.D.Texas 1985), 600 F.Supp. 1390 (court applied standard of care for "physician" to intern); *Powers v. United States* (D.Conn.1984), 589 F.Supp. 1084 (court applied standard of care for "physician" to first-year resident); *Steeves v. United States* (D.S.C.1968), 294 F.Supp. 446 (court applied standard of care for "physician" to intern who had completed formal medical education 30 days prior to examination); *Cornfeldt v. Tongen* (1977), Minn., 262 N.W.2d 684, *modified on appeal after remand*, 295 N.W.2d 638 (surgical resident who had practiced for 10 months had sufficient qualifications to render an expert opinion as to whether preoperative test results would constitute a warning to a surgeon under accepted medical practice); *Green v. State, Southwest Louisiana Charity Hospital* (1975), La.App., 309 So.2d 706, *writ denied by* 313 So.2d 601 (court applied standard of care for "physi-

cian" to doctor who practiced medicine under a temporary institutional permit granted to foreign graduates); *Lindsey v. Michigan Mutual Liability Co.* (1963), La.App., 156 So.2d 313, *cert. refused* (court applied standard of care for "physician" to intern).

Drs. Cobb and Garner and St. Vincent Hospital rely heavily upon *Rush v. Akron General Hospital* (1957), 84 Ohio L.Abs. 292, 171 N.E.2d 378, which purports to apply to interns a lesser standard of care than that applicable to physicians. In a more recent case, however, that court approved of an instruction on the standard of care for a "physician" which the lower court had applied to a first-year, postgraduate resident. The instruction "clearly informed the jury that the medical care required is that of reasonably careful physicians or hospital emergency room operators, not that of interns or residents." *Jenkins v. Clark* (1982), 7 Ohio App.3d 93, 101, 454 N.E.2d 541, 551. The Ohio court appears to have retreated from its decision in *Rush* to the position we establish today in this decision.

Dr. Cobb and Dr. Garner were practitioners of medicine bound to possess and exercise the reasonable and ordinary degree of skill, care, and diligence generally possessed, exercised, and accepted by members of their profession, including physicians with unlimited licenses, who practice in the same or similar localities. Although legislation imposes a requirement of a one-year, supervised internship on medical school graduates who seek unlimited licenses to practice medicine, this did not relieve the interns or first-year residents in this case of the standard of care owed to their patient.

Judgment reversed.

BAKER and STATON, JJ., concur.