CLYDE BAKER, Appellant, v. JOSEPH C. LANGAN, Appellee.

**Practice:** CONTINUANCE: DISCRETION. The granting of a continuance based on the absence of a witness is largely discretionary, and the ruling of the trial court will not be disturbed on appeal in the absence of a showing of abuse of such discretion. Where diligence in procuring the attendance of the witness was not shown, and the facts sought to be proven might have been established by other competent witnesses, a continuance was properly refused.

**Same:** SUBMISSION OF ISSUES: EVIDENCE. The evidence offered by plaintiff should be given the strongest interpretation in his favor, when passing upon a motion for a directed verdict for defendant at the close of plaintiff's case. In this action for malpractice the evidence is held to require submission of the case.

**Physicians:** MALPRACTICE: NEGLIGENCE: EVIDENCE. A physician and surgeon is required to exercise the skill and learning of the profession generally in the community in which he practices; and the usual and customary surgical treatment in the particular locality may be shown on the question of negligence.

Same: EXPERT EVIDENCE. A competent physician who has examined the result and learned of or knew the proper treatment of a physical injury may give his opinion as to whether he found such results as usually follow the customary treatment of a like injury by physicians possessing the usual skill of the profession in the locality where they practice.

Same: EVIDENCE. Where plaintiff testified that the condition of his health was good prior to his injury, evidence concerning the condition of his blood at that time was admissible on the question of its possible effect on the healing of the injury.

*Appeal from Clinton District Court.*—Hon. F. D. LETTS, Judge.

THURSDAY, FEBRUARY 19, 1914.

ACTION for malpractice. Defendant admitted he was a physician and surgeon, and that he treated plaintiff, but denied all allegations of negligence, and pleaded the statute of limitations. The case was tried to a jury, resulting in a directed verdict for defendant, and plaintiff appeals.—*Reversed* and *Remanded.*

*Ernest Struve* and *A. W. Walliker,* for appellant.

*Wolfe & Wolfe, R. C. Langan,* and *W. J. Keefe (M. J. Wade,* of Iowa City, of counsel), for appellee.

DEEMER, J.—As a result of an accident, plaintiff received a simple fracture of both bones of his left leg, about three inches above the ankle joint. Defendant is a physician and surgeon, and was called upon to reduce and treat the fracture, and arrived at the hospital where plaintiff was taken immediately after receiving his injuries shortly after plaintiff arrived there.

Plaintiff was in the employ of the Clinton Street Railway Company, and defendant was the surgeon of the company.

The grounds of negligence charged were:

That the said defendant carelessly and negligently failed to reduce said fracture, and to bring said fractured bones together, and failed to so bind and fasten said bones that, if brought together so as to heal, that they would remain in that position, and carelessly and negligently failed to watch and examine said bones to see if they were in a proper position, and were properly uniting and healing, and carelessly and negligently removed the splints from said limb before the bone had proper time to knit and heal together, and handled said limb in such a careless and negligent manner at this time, which was about three days after the bone had been set, disuniting said limb, if it had already knit, and carelessly and negligently failed to give the plaintiff proper instructions for the use and care of said fractured leg, and carelessly and negligently discharged this plaintiff from his care when said bones had in fact never been properly set and brought together, and while said bones should still have been caused to unite and knit together by proper treatment, and so discharged said plaintiff, without giving him any warning or notice of the true condition of his leg, which condition was well known to said defendant at the time he discharged said plaintiff, or could have been known to said defendant had he used proper care and skill to ascertain the condition of said limb before he discharged said plaintiff.

The answer was in effect a general denial and a plea of the statute of limitations.

On the issues joined the case came on for trial at the September, 1912, term of court, and plaintiff filed a motion, based upon the absence of a witness, for a continuance of the case. This motion was overruled, and this ruling presents the first question raised by the record.

1. PRACTICE:
continuance:
discretion.

Such rulings are largely discretionary with the trial court, and we do not, as a rule, interfere in the absence of a showing of abuse of that discretion, or that an injustice has been done by the order. Nothing of the kind is shown by this record.

Plaintiff did not show sufficient diligence in obtaining the

witness' testimony, and the statement as to what the witness would testify to, indicates that every material fact might have been established by other witnesses who were just as competent as the absent one.

II. The testimony for plaintiff regarding the treatment of the fracture was in substance as follows:

Dr. Langan was not at the hospital when I reached there. I think it was ten minutes after I got there before he got there. He had Dr. Keefe with him. Dr. Miller was there at that time. He was there when I reached there. I sent for him to come to the house, not the hospital; but he came to the hospital. Dr. Miller assisted in reducing the fracture. They undressed me; they took my shoes off, then took my clothes off, and then put a shirt on me. Then they tried to put the leg in shape, and pulled it out to straighten it up, and made the place where I was injured so I could see. There were no bones protruding through the skin. I was not put under an anæsthetic. I knew what was being done the little while the doctors were working there. I was given a drink of whisky; it was handed to me by a Sister. In order to reduce the fracture the physicians in attendance took hold of the foot, two of them if I remember, and pulled it out so as to put the break in shape; that is, put the leg back in shape. They went and took hold of it and tried to; all three had hold of me. Q. What they did was for the purpose of adjusting the leg in that position? A. Yes, sir; they put me in a fracture box. The fracture box looked to me as if it had hinges on it. It laid flat out, and they had adhesive plasters along the sides, and they fastened a weight on my leg and they packed it in cotton batting, or something of that sort, and they pulled up this weight, and hooked it so as to hold the leg straight. I think the box had hinges on the sides. They were two movable pieces, one on each side of the bottom. The hinges were for the purpose of raising the sides up, or to lower them in case it might become necessary. After that was completed, I was covered up, and I was lying there for awhile. Then they put water bottles on my sides to get me warmed up. At that particular time they bound my leg to this box, and I was packed inside of it. There were no bands

*2. SAME: submission of issues: evidence.*

put on my leg at this time that I know of. There were adhesive plasters put on at that first visit. I couldn't say what kind of a weight it was, whether iron or a sandbag, that was put on it; it was down at the foot of the bed. I should judge the operation lasted about thirty minutes. Dr. Miller helped to put me in position. He seemed to take as active a part as the rest of them. I should judge the operation last about thirty minutes. I believe Dr. Langan came there again that night—I couldn't say positively, but I think he was there the same evening, about 9 o'clock, or half past eight. He came to see if I was in position all right; to see whether I was all right. Dr. Langan's instructions to me were to lay still. I did as he told me. I did that as long as I remained at the hospital. Q. What were his instructions as to the use of your leg all the time you were at the hospital? A. To lay flat, and to lay still. That was all he said about it. He did not give me any new instructions in reference to the care and use of my leg after I was taken home, only occasionally he said to be careful with it, and I was. Q. Now, what was done by Dr. Langan and Dr. Keefe at this particular time that you have spoken of? Were X-rays used by Dr. Langan and Dr. Keefe for the purpose of ascertaining whether or not these bones were broken, and if more than one, and if the leg had been properly adjusted? A. No, sir. Q. When did Dr. Langan make the next visit? A. Well, every day he come. Yes, sir; he come every day in the forenoon about 9 o'clock or half past 9. His next visit was on Saturday. He looked me over then to see the shape I was in, I suppose. I don't just remember what he asked me or anything about it; but it didn't amount to much. He did not disturb the leg in any way, just looked to see if my leg was in as good shape as he left it. I was in the hospital three weeks, I think. Then I was taken home. I was confined to my home about four weeks after being taken there. I was removed from the hospital on the 27th day of March. Q. And you were in the house how long? A. Well, I got out on the porch about the 27th of March, I believe, on my crutches. Q. Well, what did the doctor tell you about when you could go out? A. Well, why, he didn't tell me. But after that I could walk back and forth to the summer kitchen; I had permission to walk out to the summer kitchen, and I used a chair in the closet. Yes; afterwards I had permission to do that. The first time I left

the house to come downtown, that was in a buggy, that was on
the 11th day of April; at that time I went downtown in a
buggy. I began using crutches about the 27th or 28th day
of March. That was just merely to walk back and forth to
the summer kitchen. Q. What did the doctor tell you about
the use of your crutches? A. He said, 'If you have to go
to the closet,' he said I could use them; yes, sir, and I did so.
I think it was about the 27th of March when I first began
using crutches. At that time I did not rest my foot on the
ground as I went along with my crutches, nor on the floor.
Q. Well, what did the doctor tell you in reference to the use
of your leg after he permitted you to use the crutches? A.
He said to hold my foot down, but not touch the floor or
ground. He told me to be careful not to bump it, and I was
always careful not to bump it. He said my leg was doing all
right. He first told me this at the time he changed the plas-
ter cast. That was about six weeks after the leg was broken.
He has never told me any different since. He told me it
never would be as it was before, but that it would be stronger.
Q. What did the doctor tell you about that, if anything? A.
About its being good? Q. Yes. A. Well, he said that the bone
was knit; that it was shortened up some, he said, so it might
not be as it was before, but would be strong after awhile so
I could use it. The next visit Dr. Langan made to the hospital
was Friday, Saturday, and Sunday, and on Monday. He had
an assistant on Monday. Dr. Keefe was his assistant at that
time. They took my leg out of the fracture box and examined
it. In taking it out, they lifted it up. Dr. Langan lifted it
up, and Dr. Keefe was at the foot of the bed and held it. The
leg was lifted up about fourteen or fifteen inches at that time,
or something like that. Dr. Langan took it out of the box and
raised it up. Then Dr. Keefe held it up, and he examined it.
He took hold of the heel with his thumb and finger, and held
it up there; he let loose of the toe, and it kind of tipped over;
he let loose of it while he was holding it up. It tipped to the
right, if I remember, and it hurt me. Yes, sir; I suffered
pain. I should judge it was held in that upright position
about 10 or 15 minutes. Then they put me back in the box,
one of those fracture boxes. They put it up to the knee, or
a little further, and then placed it in that box. Q. What else
was done, if anything, at that time? A. Well, while there
they were looking to see if the leg was in line—they were try-

ing to see if the leg was in line. I didn't understand about that. If I recollect, they got a stick and put it on the side of the leg to see if it was in line, to ascertain whether or not it was in proper position. Well, they also put it back in the box at this particular time, after they had raised it out of this one, and changed the adhesive plasters to a little bit below the other, and put on fresh ones, or fastened the other one on, or something of that kind. Well, I don't know that there was much more done. They came there and took it out of the box and examined it, and put this lining stick along it, and put it back in the box. They raised my foot up there, which caused me a great deal of pain. Q. Then you say Dr. Keefe did not hold the leg firmly. I will ask you if he held the foot firmly. A. I don't think he did. Q. At the time you were injured what was the condition of your health? A. It was good.

On cross-examination the plaintiff said:

I remained at the hospital for two weeks. At the time I left there the plaster cast was on my leg. The doctor came to see me out at home from time to time. Yes, sir; as I recollect it, I walked around on crutches to the kitchen and closet in about three weeks. I followed the doctor's directions in all things. I think I went on crutches until about the 1st of June. I followed the doctor's instructions all the time. After that I began to use a cane and crutch. As near as I can recollect, I went back to work for the car company about the 5th day of May. I was on crutches or a cane; at first I used two crutches. I followed the doctor's instructions all the time. My leg was sore all the time I was at the hospital and at home. After that I used one crutch and a cane on the job work. I guess I commenced doing that along the middle of June or the 1st of July somewhere. Q. I thought you said a while ago that you ceased using crutches about the 1st of June? A. I think about the 1st of June I disposed of them, that is, I didn't use both of them; then I used a crutch and a cane. Well, I think I continued to use one crutch and a cane in the neighborhood of two weeks after that. I quit that somewhere between the 4th and 10th of July. I think on the 4th I went on a crutch and a cane. Yes, sir; after the 10th of July, or about that time, I walked with a cane, and

continued to walk on it. I always did walk with a cane if I walked any distance. No, sir; I didn't always have to walk with a cane. If I was just going a short distance, like just across the street, I didn't. If I travel any distance, I use a cane. Yes, sir; my leg has been as now during all that time. I went up to the doctor's office all that time. Q. And on until last February, just before you commenced this suit, and you used a brace all that time? What did you talk about all that time at his office? A. He told me that he was going to California or somewhere out there to a convention, and he said that he would see if he could get a brace that would fit better than this one, used on the side of the leg, to keep it braced. Q. You talked the matter over with him to find one that would fit better because the leg would be better protected? A. He told me that he was going to get one that would fit better. I got the brace that I have now about the 1st of November, 1910. Q. From February, 1910, how did you get along until November, 1910? A. Before I had the brace I made no attempt to walk without a cane. I walked without a cane from July 1st until November, and worked every day. Dr. Langan told me that from the nature of the injuries it never would be as good as before; but he said it would be better than it is at the present time.

Skiagraphs were taken of the leg not long before the commencement of the suit, which were introduced in evidence, and these showed that, while one of the bones had united, yet it was not straight, and that there was nothing but a fibrous union of the other bone; and this was also testified to by expert witnesses introduced for plaintiff. It was the tibia, the larger of the two bones, which had not properly united. Some of these experts testified that the condition of the patient's blood had much to do with his recovery, and, in order to show this condition, plaintiff's counsel made the following record:

I am not asking you for an opinion. At the time you were injured, and just prior to your injury, when you were working about the shop and other places, whether you some time injured your hand or finger? (Objected to, as incompetent, immaterial, and irrelevant.)

By Mr. Walliker: I wish to show that the witness knew the condition, or knew about the condition, of his blood.

By Mr. Wade: It is a matter of common knowledge that sore fingers, or infected fingers, do not come from the condition of the blood, but from infections received outside.

By Mr. Walliker: It is to show that his blood was in good condition at that time.

By the Court: If at this particular time I will allow you to state— (Overruled. Defendant excepted.)

By Mr. Walliker: Did you just prior to 'fracture' sued on at any time fracture or injure your hands?

By Mr. Wade: In view of the previous objection and ruling, I want to object to this. It is the statement of counsel that the purpose of this question is to show by an injury to the hand the condition of the blood. Physicians might know the condition of the blood by an examination, while it is common knowledge infection may come from germs outside, and not from the blood.

By the Court: I think it is a matter of common knowledge that the condition of the blood may have something to do with it.

By Mr. Wade: We object for the further reason that the particular condition of the blood is not in evidence to show anything about this operation; it has no bearing upon the case, and it has not been shown there was any infection.

By the Court: The objection is sustained. There has no infection been shown. Plaintiff excepted.

Again counsel put to various experts the questions we shall now quote, and the record shows the objections and rulings thereon:

Q. You do not know anything about the original treatment of this case, do you? A. I think Dr. Langan told me about it. I know nothing about it of my own knowledge. I cannot tell at this time whether this fracture was a simple or a compound one. It is my opinion that the original reduction of the fracture was a success. Q. From the examination then made of Baker's leg, and from its appearance, did you find the leg in that condition broken legs are generally found in after the usual and customary treatment extending over a period of six weeks? (Objected to by the defense, as

immaterial, irrelevant, and incompetent.   Sustained.   Plaintiff excepted.)

Q. From your examination of said leg, did you find that the usual results had been obtained where reasonable care and skill were exercised by the surgeon in charge?   (Same objection.   Same ruling.   Plaintiff excepted.)

Q. Assuming that Mr. Baker's health was good, and his blood in good condition, in case such a fracture as that of Baker's leg is properly treated, is it customary to find such a fracture of the leg in the condition you found it when you last saw it?   (Objected to, as he is not competent to testify to that, and it is incompetent and immaterial.   Objection sustained.   Plaintiff excepted.)

Q. Now, acting on the supposition that Baker did as advised by the surgeon in charge, you may state whether or not, in your opinion, said fractured leg was properly or improperly treated, or properly or improperly cared for and looked after by the surgeon in charge.   (Objected to, as there is no foundation in the evidence for the witness to answer such a question.   Objection sustained.   Plaintiff excepted.)

Q. Is it the usual practice, in a case like that of Baker's, for the surgeon in charge to pronounce the patient cured, or cease his visits and all care and attention, while a broken limb is in the condition you found Baker's leg to be in when you last saw it?   (Objected to by the defense, as incompetent, immaterial, and asking about things not shown in the testimony, nor is proper testimony.   Objection sustained.   Plaintiff excepted.)

Q. How soon after reducing a fracture, in case the same becomes disunited, should the surgeon in charge discover it, and, if discovered, what is usually and customarily done by the surgeon in charge, in case he finds the fracture disunited?   (Objected to, as immaterial, incompetent, and irrelevant, and there is no foundation for such question; it is asking for different conditions than shown in the testimony and the difference between them.   Objection sustained.   Plaintiff excepted.)

Q. What effect would the taking hold of the fractured leg have on the fracture, if the foot is raised two or three days after the fracture was reduced, or the bony parts reunited, provided the same was done before placing the broken limb in a cast?   (Objected to, as incompetent and immaterial, and

it would depend on the nature of the injury, whether compound or simple. Objection sustained. Plaintiff excepted.)

Q. You may state whether or not raising the leg under the circumstances detailed in the preceding question would be proper treatment of the patient and the fracture, whether simple or compound? (Same objection. Same ruling. Plaintiff excepted.)

Q. Now, what is usually done when a physician is called to reduce a fracture? (Objected to, unless he states what kind of fracture is stated. It is incompetent and immaterial. Objection sustained. Plaintiff excepted.)

Q. What kind of a fracture did Mr. Baker have? (Objected to as already answered that the witness did not know, and that the question is incompetent, irrelevant, immaterial. Objection sustained. Plaintiff excepted.)

Q. Well, if a simple fracture is found, what is usually done? (Objected to, as incompetent, immaterial, and irrelevant.)

By Mr. Walliker: This fracture was one or the other, and I think the witness should be allowed to answer. (Objected to, as assuming that it was one or the other. There is no evidence of one or the other; there are other fractures besides those mentioned; it is an outside issue; there is nothing here to indicate what kind of a fracture this was. I am speaking of the bone itself, whether it was in one or two pieces; all those conditions should be found out, and what they were. You cannot even find out whether both bones were broken or only one, and the treatment would be different in either case. Objection sustained. Plaintiff excepted.)

Q. Assuming, now, that there was more than one bone broken, would the treatment be the same as if there was a simple fracture? (Objected to, as he has already testified that he could not tell, and for reasons heretofore stated. Objection sustained. Plaintiff excepted.)

Q. How long ago was it that you made this examination of Mr. Baker's leg? A. About a month ago. Q. Was this a compound or simple fracture? (Objected to, because he has already stated that he could not tell. Sustained. Plaintiff excepted.)

Q. You may state if, from the examination you made of Baker's leg and its appearance, you found the leg in that condition broken legs are usually found in after the usual

and customary treatment extending over a period of six weeks. (Objected to, as incompetent and immaterial, and asking for an opinion. Objection sustained. Excepted to by plaintiff.)

Q. You may state from your examination if you found that the usual results had been obtained where reasonable care and skill are exercised by the surgeon in charge. (Objected to, as incompetent, and there has been no foundation laid for the question. Objection sustained. Plaintiff excepted.)

Q. Assuming, now, that Baker's health was good and his blood in good condition, and if such a fracture as that of Baker's leg was properly treated, is it customary to find such a fracture or leg in the condition you found it when you last saw it? (Objected to, for reasons last given. Objection sustained. Plaintiff excepted.)

Q. Would the leg have been found in the condition you found it if the same had been cared for and treated in the usual, customary, and in a skillful manner by the surgeon in charge? (Same objection. Same ruling. Same exception.)

Q. What effect does its present condition have on Mr. Baker when he uses it in walking about, and does its use in walking give him pain? If so, why? A. It interferes with his locomotion in getting about; but whether it causes pain I am unable to state. Q. In case a surgeon treating a broken limb like that of Baker's finds that the fracture has not been reduced, and that the ends of the fracture are not united, or have not united, what is the usual and customary course pursued by the surgeon in charge, or that should be pursued in such cases? Why? (Same objection. Objection sustained. Plaintiff excepted.)

Q. Is it the usual practice, in a case like that of Baker's, for the surgeon in charge to pronounce the patient cured, or to cease his visits and all care and attention, while a broken limb is in the condition you found Baker's leg to be in when you last saw it? (Same objection, and there is no evidence on which to base such a question. Sustained. Plaintiff excepted.)

By the Court: The question in that form is objectionable.

Q. How soon after reducing a fracture, in case the same become disunited, should the surgeon in charge discover it.

and, if discovered, what is usually and customarily done by the surgeon in charge, in case he finds the fracture disunited? (Objected to, for the reason before stated, and for the reason that it is not specific as to the kind of a fracture, and the question is a compound question. Objection sustained. Plaintiff excepted.)

Q. What effect would the taking hold of the foot of the fractured leg have on the fracture, if the foot is raised two or three days after the fracture was reduced, or the broken parts reunited, provided the same was done before placing the broken limb in a cast? (Same objection. Same ruling. Plaintiff excepted.)

Q. You may state whether or not, in your opinion, raising the leg under the circumstances detailed in the preceding question would be proper treatment of the patient and the fracture. (Same objection. Same ruling. Plaintiff excepted.)

Q. You may state whether or not, after the reduction of broken or fractured limb, it is customary to use an X-ray for the purpose of ascertaining whether or not the attempted reduction was a success. (Objected to by the defense, as immaterial, incompetent, and it depends entirely on the nature of the injury received. Objection sustained. Plaintiff excepted.)

And to another witness who testified that the fracture was a simple one, the following questions were put, and the record thereon follows:

Q. What is usually done in the treatment of a fracture of that kind, Doctor? (Objected to by the defense, as there is no proper foundation laid for the question. It is incompetent and immaterial. Objection sustained. Plaintiff excepted.)

Q. From the examination you made at that time, was the attempt to reduce the fracture originally a success? ( Objected to, as immaterial, incompetent, and asking for the opinion of a witness without stating the facts. Objection sustained. Plaintiff excepted.)

Q. Now, from your examination then made of Mr. Baker's leg, and from its appearance, did you find the leg in the

condition broken legs are usually found after the usual treatment and customary treatment extending over a period of six weeks? (Objected to by the defense, as no foundation has been laid, and, from the facts shown by the record, it is assuming facts in the question. It is incompetent and immaterial. Objection sustained. Plaintiff excepted.)

Q. From the examination of said leg, did you find that the usual results had been obtained by the surgeon in charge? (Same objection. Same ruling. Plaintiff excepted.)

Q. In case a surgeon treating a broken limb like Mr. Baker had finds that the fracture has not been reduced, and that the ends of the fracture are not united, or have not united, what is the usual and customary course pursued by the surgeon in charge, or that should be pursued in such cases? Why? (Same objection as generally made before. Objection sustained. Plaintiff excepted.)

This was in addition to questions propounded to all of the other experts, which we have already quoted. From this record, it is apparent, we think, that a verdict for the defendant should not have been directed. The defendant introduced no testimony, and that offered and received for and on behalf of plaintiff should be given the strongest interpretation in his favor.

Of course no one may expect as strong a leg after as before a fracture, and no physician or surgeon is held to a guarantee of results; but he is held to the exercise of the skill and learning of the profession generally in the community in which he practices. Whether he did that or not in a particular case may be proved either deductively or inductively, and the usual and customary treatment of physicians and surgeons in the particular locality may be shown in order to ascertain whether or not the defendant exercised the skill required of him.

3. PHYSICIANS: malpractice: negligence: evidence.

We think, too, that competent physicians and surgeons who have examined the result and learned of the treatment

or knew what treatment should have been given, if assured of the patient's prior condition of health, and of his own care and treatment of the fracture, may properly give an opinion as to whether or not they found such results as usually follow from the customary treatment of such a case by men possessing the usual skill and learning of their profession in the locality where they practice. Such testimony must of necessity be admissible, for it may happen that the injured man is incapable himself of accurately describing the treatment given. Moreover, to some of the witnesses a part of the treatment was described according to the testimony, and they were asked the question as to whether it was the usual and customary method of caring for such an injury.

4. SAME: expert evidence.

Most, if not all, of the questions put to these witnesses which we have copied into the record should have been answered. See *Peck v. Hutchinson*, 88 Iowa, 320, *Rogers v. Kee*, 137 Iowa, 260.

III. There may be some doubt regarding the rulings on the questions propounded to show the condition of plaintiff's blood at the time he was injured. It is true that plaintiff is not complaining of any infection; and that what are generally termed blood troubles arise from infections of various sorts; but it is shown by this record that the condition of plaintiff's blood might have had something to do with the success of the treatment given him by defendant.

5. SAME: evidence.

Now, while what are usually called blood troubles result from infection, it is not true that every infection of a wound results in harm; to some extent this depends upon the condition and consistency of the blood, its normal or subnormal admixture of proper elements, and whether or not it has the usual powers of resistance within itself. In view of the other testimony in the case, we are inclined to think the witness should have been permitted to answer the questions propounded, leaving the final conclusion to the jury.

In view of the fact the witness testified that his health was good before the accident, we would not be inclined to reverse if the last-mentioned rulings were the only errors in the case; but, in view of a retrial, we have given out views upon the matter in order that the error may not be repeated. Some of the rulings before set out are not specifically pointed out as error; but some of the more vital and material ones were, and, in view of the entire record, it appears that the plaintiff did not have a fair trial.

For the reasons stated, the judgment must be reversed, and a new trial ordered.

*Reversed* and *Remanded.*

LADD, C. J., and GAYNOR and WITHROW, JJ., concurring.