Argued September 27; reversed November 15, 1949

## MALILA *v.* MEACHAM
### 211 P. 2d 747

*T. H. Ryan* argued the cause for appellant. On the brief were Ryan & Pelay, of Portland.

*Frank S. Senn* argued the cause for respondent. On the brief were Senn, Recken & Recken, of Portland.

Before Lusk, Chief Justice, and Brand, Rossman, Hay and Page, Justices.

LUSK, C. J.

Plaintiff sued the defendant, a dentist, for malpractice, and recovered a judgment based upon the

verdict of the jury. Upon motion of the defendant the court entered an order setting the verdict aside and granting a new trial. From that order the plaintiff has appealed.

The principal issue of fact developed in the testimony was whether the defendant was negligent in extracting two of plaintiff's teeth at a time when plaintiff was suffering from Vincent's infection or trench mouth. It was plaintiff's contention that the infection was acute and that the indicated treatment was to clear up the trench mouth condition before resorting to surgery; that to extract the teeth in the presence of the infection was likely to cause its spread, and that in fact the infection did spread, attacking the right inferior dental or mandibular nerve, with the result that the plaintiff sustained a loss of feeling in her right lower lip and in the right lower jaw. The defendant, on the other hand, contended that the trench mouth condition was not acute, and that, in view of the abscessed condition of the teeth and the intense pain from which the plaintiff was suffering, immediate extraction was imperative.

The trial judge set aside the judgment because, in his view, there was no medical testimony of the kind which the law requires to support it. He recited in the order that "it is indispensable to the plaintiff's right to recover in this case that testimony be offered by a qualified expert that the practice followed by the defendant * * * was not in keeping with the degree of care which is ordinarily and usually exercised by the ordinarily careful and skillful dentist specializing in extractions under like circumstances in Portland and like localities." The only attempt by the plaintiff to meet this test, it was said, was the testi-

mony of Dr. Lloyd M. McCormick, a dentist called as a witness by the plaintiff, to whom a hypothetical set of facts was stated, after which the witness was asked, "Q Assuming that those facts did exist, would you say it was proper practice to extract a tooth under those conditions?", to which he answered: "I would say it was not proper practice." The trial judge concluded that the testimony quoted did not suffice to make out a prima facie case of malpractice, citing as authority the following statement from *Lehman v. Knott,* 100 Or. 59, 71, 196 P. 476:

> "The distinction between improper treatment and negligent treatment is not as broad as it is vital. Improper treatment by a surgeon might be due to an error in judgment of a skillful surgeon honestly and carefully exercised, and not constitute negligent treatment: Dishman v. Northern Pac. Beneficial Assn., 96 Wash. 182 (164 Pac. 943)."

■ In *Lehman v. Knott* the court held that it was error to allow a medical witness to testify whether the application of side splints by the defendant physician was "unskillful and negligent". To the same effect are *Schamoni v. Semler,* 147 Or. 353, 358, 31 P. (2d) 776; *Patterson v. Howe,* 102 Or. 275, 288, 202 P. 225. It was in connection with that holding that the language relied on by the trial judge and by counsel for the defendant was used. It is difficult to perceive the relevancy of this statement to the question which the court was deciding. Previously in the opinion the court had said (100 Or. 70):

> " * * * In a malpractice case the question whether a physician has in a given case adopted the proper treatment is one in which the opinions of medical men may be received in evidence and they may state whether in their opinion the treat-

ment was proper or not, whether it was in conformity with the rules and practice of the profession: Rodgers on Expert Testimony (2 ed.), § 64; 22 C. J., p. 663, § 758; Heath v. Glisan, 3 Or. 64; Hoener v. Koch, 84 Ill. 408; Taylor v. Kidd, 72 Wash. 18 (129 Pac. 406)."

The foregoing statement has been repeated in three subsequent cases. *Hilgedorf v. Bertschinger,* 132 Or. 641, 646, 647, 285 P. 819; *Lippold v. Kidd,* 126 Or. 160, 163, 269 P. 210, 59 A. L. R. 875; *Emerson v. Lumbermen's Hospital Assn.,* 100 Or. 472, 480, 198 P. 231. See also, *Heath v. Glisan,* 3 Or. 64, 67 (charge to jury by Upton, J.). So far as we are aware, there is no decision in this state that such testimony is inadmissible. If it is admissible it must be because it is pertinent to the issue of malpractice; otherwise, it should be excluded. Counsel for the plaintiff should have the right to rely on these pronouncements of this court, and they should be adhered to unless the rule they announce is demonstrated to be unsound or likely to bring about miscarriage of justice. Neither of these things, in our opinion, is true.

It is undoubtedly the rule that a physician is under the obligation in treating a patient to exercise such reasonable and ordinary care, skill and diligence as physicians and surgeons in good standing in the same neighborhood, in the same general line of practice, ordinarily have and exercise in like cases (*Carruthers v. Phillips,* 169 Or. 636, 647, 131 P. 2d 193; *Wemett v. Mount,* 134 Or. 305, 314, 292 P. 93), and that a greater degree of skill is exacted by the law of the medical practitioner who specializes in any branch of his profession, as, for instance, a surgeon, than the physician who engages in general practice. *Rayburn v. Day,* 126

Or. 135, 142, 268 P. 1002. These rules apply equally to dentists. *Schamoni v. Semler*, supra; *Patterson v. Howe*, supra. Consequently, the plaintiff in an action in malpractice has the burden of proving that the conduct of the defendant in his treatment of his patient did not measure up to the standard thus prescribed, but it does not follow, as the defendant contends, that the proof must be in the words of a particular formula. If the medical witness testifies in substance to what amounts to a failure of the dentist to conform to the standard, that ought to be sufficient. The question, therefore, is whether an opinion of a qualified medical expert that a given treatment was not proper does, in substance, constitute evidence of such fault. We think that it should be so held.

The medical witness is not permitted to testify at all as an expert unless he has first qualified by showing that he possesses the requisite skill and knowledge to arrive at an intelligent conclusion touching the subject-matter of the dispute. See 20 Am. Jur., Evidence, 656, § 783. In a malpractice case that includes knowledge of the method of treatment customarily used by other members of the profession practising in the locality where the alleged negligent act occurred. Physicians who have practiced at that place and who have been found by the court to be qualified expert witnesses, or testify as such without objection, must be assumed to have such knowledge; and, when such a witness answers the question whether a particular treatment is proper or improper, it would be unreasonable to suppose that the opinion he gives has reference to anything other than the standard of care generally observed by the profession in the particular locality. The words "proper" and "improper" in such a connotation refer to a

standard, for one definition of the word "proper" is "conforming to a standard of useage or action". Funk & Wagnalls New Standard Dictionary 1941. We think, therefore, that for the qualified witness to testify that the treatment given was improper is equivalent to saying that it was not in accordance with the accepted standard. If, perchance, opposing counsel should have any doubt about the meaning which the answer is intended to convey—whether, for example, the witness is merely stating his personal views—it would be a simple matter to resolve such doubts by cross-examination.

In this case Dr. McCormick, it was shown, graduated with the degree of doctor of dental medicine in 1926 from the North Pacific College of Oregon, now the University of Oregon Dental School, had practiced his profession in Portland for twenty years, had made a special study of Vincent's infection and frequently treated patients suffering from that ailment, and had done extracting, although he was a general practitioner. No objection was made by the defendant to his qualifications as an expert witness. No objection was made when he was asked to state whether it was proper practice to extract a tooth under the conditions described in the hypothetical question. After he had answered the question, defendant's counsel moved to strike the answer "because it is not a proper question, not hypothetically put". This was manifestly not a valid objection because the question was hypothetically put. But, even though objection had been made on the ground now urged, we think that it should have been overruled because it was competent for Dr. McCormick to testify whether the treatment given by the defendant was proper or improper, and his answer tended to prove

the basic charge of malpractice. Moreover, his cross-examination affirmatively discloses, if such disclosure were necessary, that his answer on direct examination was given with regard to the standard observed by the profession in Portland. He testified:

"Q Well, if she had an abscessed tooth would you still say it shouldn't have been pulled?

"A If she had the abscessed tooth and the trench mouth as Dr. Meacham testified, both at the same time, it should not have been extracted.

\* \* \*

"Q But if she had trench mouth you would still say you shouldn't pull the tooth?

"A If she had trench mouth in the manner he testified she had and the symptoms he gave I would not.

"Q You would not?

"A I would not, and the ordinary dentist in this community would not.

"Q What other dentists would do you don't know? Is that right?

"A Well, I have been associated with them for twenty years. I know pretty well what they are doing.

"Q Please answer the question. What other dentists are doing you wouldn't know?

"A Yes, I would know. I don't know what each individual would do, but I know what the majority would do. We get together in different meetings and the questions are discussed—that one isn't because it is pretty well settled, but I would know."

In addition to the authorities already cited the following support the view we take of this question: *Carpenter v. Walker,* 170 Ala. 659, 54 So. 60, Ann. Cas. 1912D 863; *Bishop v. Spining,* 38 Ind. 143; *Longfellow v. Vernon,* 57 Ind. App. 611, 105 N. E. 178; *Baker v. Langan,* 165 Ia. 346, 145 N. W. 513; *Spaulding v. Bliss,*

83 Mich. 311, 47 N. W. 210; *Olmsted v. Gere,* 100 Pa. 127 (dictum); *Willard v. Norcross,* 81 Vt. 293, 69 Atl. 942; *Dorr, Gray & Johnston v. Headstream,* 173 Ark. 1104, 295 S. W. 16; *Taylor v. De Vaughn,* 91 Cal. App. 318, 266 P. 960. There are decisions to the contrary, but they are in conflict with the precedents in this court and do not appeal to us as sound.

■ The foregoing does not dispose of this case, since there were other grounds assigned in support of the motion for a new trial, and the rule is that an order allowing such a motion will not be disturbed on appeal if the record discloses any tenable ground in support thereof, although such ground may not be recited in the order or although the order recites a different ground. *Zeek v. Bicknell,* 159 Or. 167, 169, 78 P. (2d) 620; *Arthur v. Parish,* 150 Or. 582, 586, 47 P. (2d) 682; *Fennell v. Hauser,* 145 Or. 351, 358, 27 P. (2d) 685, 28 P. (2d) 245; *Karberg v. Leahy,* 144 Or. 687, 692, 26 P. (2d) 56; *Cicrich v. State Industrial Accident Commission,* 143 Or. 627, 635, 23 P. (2d) 534.

We proceed to a consideration of the other grounds of the motion.

■ The defendant contends that the court erred in permitting Dr. McCormick to testify to certain statements made by the plaintiff to him. Mrs. Malila consulted Dr. McCormick in March, 1946. Dr. McCormick testified that he took her history, that she told him that she had had some teeth extracted in September, 1945, and that the next morning there was numbness in her face which became progressively worse. Counsel for the defendant objected to this testimony on the ground that Dr. McCormick did not treat the patient, and, therefore, that the statement was not binding on the defendant. The evidence, however, shows that the plain-

tiff consulted Dr. McCormick for the purpose of treatment. The fact that he did not treat her (since he concluded that there was nothing that he could do for her) is beside the point. The question, therefore, is not governed by the restrictive rule which applies to a physician who examines a person merely for the purpose of qualifying himself as a witness, as in *Reid v. Yellow Cab Co.*, 131 Or. 27, 279 P. 635, 67 A. L. R. 1. The testimony about the history of the plaintiff's injury and her complaints was admissible, not as proof of the facts stated to Dr. McCormick, but as showing the basis of his diagnosis. *Watrous v. Salem Brewery Ass'n.*, 151 Or. 294, 303, 49 P. (2d) 375; *Wise v. State Industrial Accident Commission*, 148 Or. 461, 472–474, 35 P. (2d) 242.

Finally, it is urged that the evidence is insufficient to support a judgment for the plaintiff. The defendant argues, among other things, that, at most, the evidence shows no more than an honest mistake of judgment on his part, for the consequences of which he is not liable. This contention requires a review and analysis of the evidence.

Dr. Meacham, the defendant, is a specialist in oral surgery, exodontia and periodontia. These include extraction of teeth, treatment of infected conditions of the gums, and elimination and removal of other types of infection from the mouth. The defendant had practiced his profession in Portland for twenty-four years at the time of the trial.

Mrs. Malila, the plaintiff, accompanied by a friend, called at the office of the defendant on the morning of September 11, 1945, for the purpose of having a tooth extracted. The right side of her face and right lower jaw were badly swollen and she was suffering ex-

cruciating pain. Dr. Meacham took X-rays, which disclosed that the plaintiff's lower right second bicuspid and lower right molar were abscessed at the roots. From certain symptoms which appeared, notably a very bad breath, the defendant concluded that Mrs. Malila was afflicted with Vincent's infection or trench mouth, which is described as an infection in the gums around the teeth and the mucous membranes of the jaw. The defendant had a laboratory analysis made of material which he took from her mouth. The laboratory report was "3 plus trench mouth", which, according to the defendant's testimony, indicated a subacute infection. The plaintiff's mouth was thoroughly irrigated and certain vitamins and a mouth wash prescribed for the Vincent's infection. The defendant testified that he knew that the vitamins would not take effect before the operation, that as a general rule one can observe very noticeable effects within a matter of three days. Being too busy at the time to give the plaintiff further attention, he directed her to return in the afternoon. This she did and the abscessed teeth were then extracted. She was given a general anesthetic. After the extraction Mrs. Malila returned several times to the defendant's office for further treatment.

The day after the teeth were extracted the right side of the plaintiff's lower jaw was numb; as she explained it, "it felt as if I had novocaine". Since then she has had no feeling on the right lower side of her face, including her lip; the inside of her mouth, though not the tongue, is numb; she has trouble enunciating her words and trouble eating; she has at times bitten her lip and blood has come from her mouth without her knowing anything about it. The evidence on behalf of the plaintiff tends to show that the mandibular or

inferior dental nerve, a sensory nerve which comes from the base of the skull and runs through the mandibular canal—a channel in the bone of the jaw—, had been destroyed. Dr. McCormick testified that in his opinion this destruction had resulted from the extraction of the plaintiff's teeth by the defendant and the consequent spread of the trench mouth infection to the nerve. It was this destruction of the nerve which brought about anesthesia in the plaintiff's face. Extraction of the teeth, Dr. McCormick testified, opens up the area where the nerve and arterial system lie, allowing the germ to attack the nerve and other tissues. He testified that swelling of the jaw and the face and the area around the teeth and the gums, the emission of a foul odor from the mouth, great soreness of the gums, and a hard area around the gums, and loose teeth —of all of which there was evidence—were the clinical factors of acute trench mouth, and, as stated, that it was not proper practice to extract teeth under those conditions because of the danger of spread of the infection. The organisms then have direct entry into the blood stream, which can result in a general blood poisoning. There have been cases where death resulted from an operation in the presence of the disease.

By way of defense it was claimed, first, that the trench mouth condition was not acute, and, second, that even though acute, in view of the excruciating pain which the plaintiff was suffering and the danger of the spread of infection from the abscessed teeth if they were not removed at once, the defendant was faced with a choice of evils, and that he used his best judgment in resorting to surgery. The defendant's opinion that the trench mouth condition was subacute was based in part on the laboratory report that the

slide showed "3 plus trench mouth". He testified, however, that certain conditions which are found only in acute trench mouth, such as breaking down of the gum tissue, were not present in this case. But Dr. Mc-Cormick testified that the numbers—1 to 4—used in reporting the result of the laboratory analysis have nothing to do with the stage of the disease, but merely indicate the number of spirillum or bacteria. Moreover, the defendant, in a pretrial deposition, had testified that when the plaintiff first came to his office "she had a bad trench mouth condition" and "We didn't have to run a slide to determine whether or not she had it. The odor would knock you down when she came in the room. But it is a procedure to check those things, as a matter of record."

Dr. Frank Mihnos, a dentist who was called as a witness for the defendant, was questioned about the difference between the acute and the subacute types of trench mouth on cross-examination. He testified that the acute type is easily recognizable while the subacute is not; that one would probably be aware of the former immediately, while, as to the latter, one would be more careful by taking a smear or something of that sort. He said that the slide is not used as much as formerly, that the presence of the infection can be detected by the constitutional symptoms which are present generally in the acute stage and not in the subacute. By "constitutional symptoms" is meant, according to Dr. Meacham, the "physical condition of the patient, the way they feel, the general health situation". An authoritative medical text produced by counsel for the plaintiff thus describes these symptoms:

"The acute form of Vincent's gingivitis may have a sudden onset. The patient may have an in-

testinal disturbance varying from indigestion to diarrhea. There may be a high fever and an acceleration of the pulse. Headache, restlessness, insomnia, and physical fatigue may also be present. The gingival tissues are red, swollen, and painful, bleed easily, and have a raw appearance. Generally there is a punched-out appearance of the interproximal gingival margins. A putrid odor emanates from the mouth. The patient complains that the teeth ache and seem loose. The bleeding, which may be spontaneous, is due to the destruction of the normal epithelium with exposure of the gingival corium. The process of this disease is of a destructive gangrenous nature. Later deep ulcerations take place beneath the pseudomembranous patches.''

Dr. Mihnos was shown the X-rays taken by Dr. Meacham before the extraction and testified concerning them as follows:

''A There are two teeth here. Do you notice a larger dark area through there? I think this tooth here (indicating) is the one probably that was doing the most of the dirty work. It had a large cavity underneath this bridge and it was draining through that area, but the area was so large down here that it couldn't take care of it all, so it got a large abscess there.

''Q Where is that located as to the root of the tooth?
''A That is the root end of the tooth, and it is the second bicuspid.

''Q Is that definitely abscessed or not?
''A There is a definite bone change, yes.

''Q What do you mean by a bone change?
''A The bone is not normal. That would be an infectious thing. * * * The bone at the root end of that booth has been dissolved out because of infection. In the first place there was a large cavity underneath the bridge that the patient had, and it

had burrowed this way into the nerve, and that died, and eventually the thing has become infected and abscessed, as we call it.

"Q How about the other one, the molar?

"A The other one has an inflammatory process at the root end, the same way. There has been a leak underneath that bridge too.

"Q Were both of those abscessed?

"A Both of those teeth were abscessed.

   *   *   *

"Q What would you say as to the advisability of pulling a tooth in that condition?

"A Well, our X-ray shows an abscessed tooth. It doesn't show the condition of anything else but the bone around the root end there, and I would think the thing to do would be to get rid of it, in fact that is the only thing you can do, that you have a right to do."

On the question whether it was proper practice to extract the plaintiff's teeth, Dr. Mihnos testified: "I would take those out myself * * * The thing to do in any good surgery is to get drainage. Now if one can't make an opening, that is, lance it and get drainage, we are justified in taking that tooth out. The tooth is a foreign body; we have got to get rid of it." It was suggested to Dr. Mihnos on cross-examination that the trench mouth condition might be relieved, and he testified that usually control could be gotten of it pretty fast—that sometimes it took two or three days, sometimes two weeks; that perhaps three or four days was an average: "A good toothache", he said, "doesn't respond to any of the sedatives that I know of, which includes morphine." He admitted that extraction in the presence of acute trench mouth might result in death, and he further testified:

"Q In other words you could relieve this condition in three or four days, you could reduce the

pain by going in through the tooth, and still you would risk the patient's life in order to give them a couple of days' comfort?

"A The tooth was open already, so there had been drainage. Both of them had cavities, so there was a chance for drainage.

"Q Couldn't you make the drainage better by running a broach down through?

"A Possibly.

"Q Wouldn't that be the proper procedure?

"A Not being there, I couldn't tell you.

"Q Wouldn't you at least try it, Doctor, if this trench mouth was acute?

"A I probably would have.

"Q And the ordinary specialist in this field would too, would he not?

"A Well, he would try any method, anything that he could to lessen the pain with the least amount of risk, there is no question about that."

He testified that in "advanced cases [of trench mouth] that are acute with a gangrenous type of thing no one would extract a tooth."

Dr. Neal L. Zimmerman, a dentist of thirty-one years' experience, specializing in the extraction of teeth, was a witness for the defendant. He testified that under the conditions disclosed by the testimony he would extract the abscessed teeth "because I would feel that the patient was in more danger leaving the teeth in than if I took them out"—the danger being that the infection from the abscessed teeth might penetrate deeply into the substance of the bone and produce osteomyelitis, or that the infection would force its way through the gums and create a running sore or fistula. On cross-examination he said that he would not ordinarily extract teeth in the presence of acute Vincent's

infection unless the circumstances of the case justified, and that such circumstances would be acute apical abscess—that is, abscess at the end of a root of a tooth where there is possibility of the infection going deeper. It would be possible to relieve the abscessed condition without removing the tooth by lancing alongside the tooth and draining, but in that event "you open up the blood vessels just the same [as in extraction] and you don't remove the source of the trouble." When the infection had gone as far as it had in the present case it would do no good to drill into the tooth. He testified that he had operated many times in the presence of acute Vincent's infection.

Dr. Meacham testified that he extracted the plaintiff's teeth because, in view of the acute infection in the roots, it was proper procedure in order to give the patient necessary relief and to avoid serious consequences otherwise. "Had the teeth been left in we may have had, as has been explained by Dr. Zimmerman, an invasion of surrounding bone tissue and a possible infection that would destroy a great deal of the jaw." The infection, he said, had spread into the soft tissues on the side and into the inferior area underneath. That is what made the acute condition. Where there is a question of taking out a tooth which does not hurt and there is a trench mouth condition the procedure is to clear up the trench mouth condition before extracting. A tooth does not hurt unless there is an acute condition.

We quote from his cross-examination:

"Q Now, Doctor, in the condition of Mrs. Malila's mouth the primary thing to do was to relieve her pain, wasn't that it?

"A The primary thing was to relieve her pain and prevent spreading of the infection in the adjacent bone structures.

"Q How soon would the infection spread into the bone structures?

"A Sometimes it happens very rapidly and other times it may take several days for it to spread, you don't know when. It might have happened between the time she was in there in the morning and the time we operated at three o'clock in the afternoon.

"Q Did you think it was necessary to operate immediately?

"A Yes, I did.

"Q Because of pain or spreading of the infection?

"A Both, I said.

"Q Now, it was possible to drill down into the tooth to relieve the pus condition and pain, wasn't it?

"A That is very questionable because as the X-rays showed in both teeth the cavities had extended into the pulp chamber and the pus had those passageways to come out through the roots apparently but more of it formed than could come out through this small opening.

"Q What is a broach, Doctor?

"A A broach is a small wire-like instrument that is usually attached—they have a handle for it, that is you can more or less screw it down into the top of the tooth, the crown of the tooth, down into the pulp chamber and into the nerve canal.

"Q Could you have used that to relieve the pressure?

"A Well, yes, if you could have had somebody to hold the patient down or keep her under anaesthetic long enough, but in her case we gave her nitrous oxide and in her highly nervous condition we didn't consider it wise. It isn't practicable in those cases to do some prolonged type of operation where it is questionable whether it is going to give results. We are after results as quickly as possible to relieve the pressure.

"Q It would have, however, been possible to do that under a general anaesthetic, would it not?

"A Oh, it would be possible certainly but not practicable.

"Q She was suffering from very intense pain at the time?

"A Yes, sir.

"Q Would it be possible to do it in the presence of that pain?

"A Not without an anesthetic. Her teeth were very, very sore to the touch. She had a bridge, as the X-ray will show. You would have to remove that bridge in order to get in there. You couldn't have done that in her case without an anaesthetic, I will assure you. * * * "

On cross-examination relative to the seriousness of the trench mouth condition the defendant admitted that he had testified as follows in a pretrial deposition:

"She had a bad trench mouth infection. We treated for that before doing any surgery because we don't like to do any surgery where there is trench mouth present. She was suffering intense pain and wanted immediate service. We took her to a medical dental surgery and they,—she was given nitrous oxide gas, under which I removed the two teeth that the X-rays had disclosed to be badly infected."

Asked what he meant by "bad trench mouth condition" he answered:

"Subacute type, not an extreme type; subacute type which the slide indicated was taken to be 3 plus, 3 plus associated with the infected condition she had in the teeth produces a bad situation, as we might say, in there but not an impossible situation."

"Q Could you tell from the odor, Doctor, that she had trench mouth?

"A There was that peculiar odor of suppuration, you might say, that would indicate possible trench mouth.

"Q In other words, you can tell trench mouth from the odor?

"A In a great many cases you can, in some you can't.

"Q Would you say the odor was extremely bad in her case?

"A Well, it was noticeable when talking to her. It is a fetid odor that you get. Anybody in this room that has a badly abscessed tooth has a fetid odor and probably in that case you may have a certain type of trench mouth.

"Q All right. Do you remember when taking this deposition in answer to my question, first I asked you: 'Question: How did you determine she had this trench mouth condition? Answer: We ran a slide. Question: Did you do that when she first came in? Answer: The first sitting, yes. We didn't have to run a slide to determine whether or not she had it. The odor would knock you down when she came in the room. But it is a procedure in our office to check those things, as a matter of record.' "

He admitted that the foregoing statement in his deposition was true.

He testified that he told her that she had trench mouth.

"Q In answer to my question in your deposition you said, 'Hell, she knew it. She could smell it.' Was the smell that bad?

"A It ought to be noticeable to the individual when other people can notice it."

Relative to the proper procedure to be followed, the defendant testified on cross-examination:

"Q Isn't it a fact, Doctor, that in the face of active trench mouth condition an extraction is

contra-indicated by all practitioners and good authority?

"A No.

"Q Is it contra-indicated under normal procedure?

"A If you will explain normal procedure I can answer that.

"Q I will read your answer. Maybe you can explain your answer in the deposition. 'It is contra-indicated under normal procedure, but the procedure which is followed in cases where a patient is suffering intense, excruciating pain, it is just the lesser of the two evils.' How do you explain that? Is that your answer today?

"A My answer is, in cases such as we are discussing here where there is an acute infection involving the teeth you cannot be deviated from your proper procedure by the fact that there is to some degree a trench mouth infection present in the mouth.

"Q Doctor, in this deposition there was nothing said about the seriousness of the infection. The only thing that you stated was that the patient was suffering from intense and excruciating pain, and for that reason you couldn't give her any relief and didn't feel that you could postpone the operation. Now would pain of itself be a sufficient cause to go ahead and operate in the presence of an active trench mouth condition?

"A Yes, it would be. Severe and excruciating pain would be sufficient ground if there was no other practical way to relieve it, because our purpose is the relief of discomfort of our patients.

* * *

"Q There is a great deal of danger because of this condition? Is that not true, Doctor?

"A There is not a great deal of danger; it is just a hazard that you don't take unless you have to. One of the things is, the patient is not in a

condition to respond as well to surgery as they are where you have a real healthy field to work in.''

As already indicated, Dr. McCormick was of the opinion that it was improper practice to extract the plaintiff's teeth, even though they were infected, in the presence of acute trench mouth. He conceded on cross-examination that adequate drainage is the fundamental aim of all surgery and that extraction of an abscessed tooth is one of the ways of getting drainage. On rebuttal he was asked about another method and testified as follows:

"Q (by Mr. Ryan) Doctor, will you tell what method can be used to relieve pain in the presence of an acute trench mouth condition, to relieve an abscess that might exist, so that the trench mouth condition could be made quiescent?
\* \* \*

"A Well, I was under the impression that sedatives could be used to some extent, if not giving absolute relief at least giving some scintilla of relief, and I absolutely am of the opinion from looking at those X-rays, and I agree with what has been said here, that they are open and all that, but the purpose of going down those canals with a broach is because the canals are fine, and the pus and thick, viscid fluid starts to get out that way and there is gas formation down there and the canal fogs up. You take a broach, which is a little fine wire, and you go down there and pump it back and forth and it has little barbs like a fishhook. When you pull it up you pull all the accumulated debris up, and in lots of case you get drainage. You don't in every one, but it is worth trying.''

In this case the negligence alleged in the complaint is that the ''defendant did diagnose and did prescribe the extraction of certain teeth, namely a lower right bicuspid and lower right molar, and did extract said

teeth as a part of his prescribed treatment of plaintiff but the defendant in treating plaintiff did so, so carelessly and negligently as to injure the mandibular nerve, which the defendant knew, or should have known in the exercise of reasonable diligence, would be injured by his treatment and the defendant could have avoided this injury to the plaintiff had he exercised reasonable care."

The question for decision is whether there is substantial evidence to support the foregoing allegations.

There is substantial evidence that the plaintiff was suffering from acute trench mouth at the time that her teeth were extracted. Dr. McCormick so testified. The defendant's witness, Dr. Mihnos, testified that the acute type of trench mouth is easily recognizable while the subacute is not, and that one would probably be aware of the former immediately while as to the latter one would be more careful by taking a smear or something of that sort. Dr. Meacham swore in his pretrial deposition that "she had a bad trench mouth condition" and "We didn't have to run a slide to determine whether or not she had it. The odor would knock you down when she came in the room." The evidence of these two witnesses, when considered together, tends to support Dr. McCormick's opinion.

Of the four experts who testified, only Dr. Zimmerman and the defendant claimed that it was ever good practice to extract a tooth in the presence of acute trench mouth, and the jury would have been warranted in finding that it was bad practice, not only from Dr. McCormick's testimony, but as well from standard authorities produced by counsel for the plaintiff on cross-examination of the witnesses for the defendant, and which we have not thought it neces-

sary to refer to more specifically. Furthermore, it might have been inferred from some of the answers given by Dr. Mihnos that he doubted the propriety of extraction under the circumstances, until, at least, some other method of relieving from the abscessed condition of the teeth was tried. On the question of proximate cause the testimony of Dr. McCormick furnished substantial basis for a finding that the destruction of the plaintiff's inferior dental nerve, with the consequent loss of sensation, was brought about by the extraction of her teeth.

To all this it is answered by defendant's counsel that, at most, the defendant, faced with a situation in which he was required to decide upon a course of action, did but use his honest judgment in electing to pursue the course he took, and that for an error of judgment, if errer there was, the law will not hold him guilty of malpractice.

It is well settled that a physician or dentist is not a warrantor of cures, that the doctrine of *res ipsa loquitur* does not apply in malpractice cases, and that, if a regularly licensed physician or dentist with reasonable diligence employs the skill of which he is possessed in treating a surgical case, he is not liable for an error of judgment. *Moulton v. Huckleberry,* 150 Or. 538, 46 P. (2d) 589; *King v. Ditto,* 142 Or. 207, 19 P. (2d) 1100; *Rayburn v. Day,* supra, 126 Or. 150; *Emerson v. Lumbermen's Hospital Assn.,* supra, 100 Or. 481; *Lehman v. Knott,* supra, 100 Or. 71; *Hills v. Shaw,* 69 Or. 460, 467, 137 P. 229; *Williams v. Poppleton,* 3 Or. 139 (1869). In *Moulton v. Huckleberry,* supra, the court explained the limitations of the rule as follows (150 Or. 546):

"It has sometimes been broadly held that a physician or surgeon is not liable for an honest error

or mistake in judgment. Nevertheless a limitation of this broad rule is recognized in cases that exempt from liability for errors of judgment only where there is a reasonable doubt as to the nature of the physical condition involved or as to the proper course to be followed, or where good judgments may differ. Also another limitation of the broad rule stated is found in cases that hold that a qualified physician is not liable for an error of judgment if he applies ordinary and reasonable skill and care: 48 C. J. 1127, § 114.''

▪ In other words, to avoid liability the judgment of the physician or surgeon must be founded in his intelligence, skill, knowledge and care. *King v. Ditto,* supra, 142 Or. 217; *Rayburn v. Day,* supra, 142 Or. 151.

The real question presented is whether the court can say as a matter of law that the defendant was guilty of nothing more than an error of judgment, or whether that question should have been submitted to the jury, as it was in this case in the charge of the trial judge. Of the cases above cited, all dealing with a claim of mere error of judgment, the only ones in which the court held as a matter of law that the defendant was not guilty of malpractice were *Hills v. Shaw* and *Emerson v. Lumbermen's Hospital Assn.* In neither of these cases was any expert testimony introduced tending to show that the defendant had adopted or used an improper method of treatment. Both decisions were based fundamentally on the proposition that a bad result, without more, is no evidence of malpractice.

But here we have expert testimony as to the impropriety of the defendant's treatment of the plaintiff. It may be conceded that the abscessed teeth would eventually have to be extracted; the evidence, however,

is in conflict as to whether that should have been done immediately and as to whether the defendant should not have resorted first to some other means of relieving the plaintiff's pain and alleviating the abscessed condition of her teeth, in the meantime taking appropriate measures to bring the trench mouth infection under control. Dr. Mihnos testified that extraction in the presence of acute trench mouth might result in death. He further testified that better drainage of the infected teeth could possibly have been obtained by the use of a broach and that he probably would have tried it if the trench mouth condition was acute; that the ordinary specialist in this field would try any method, anything that he could to lessen the pain with the least amount of risk. It is true that Dr. Meacham testified that it was not practicable to use a broach and that in the patient's highly nervous condition he did not consider it wise to subject her to such a prolonged type of operation under a general anesthetic. It is also true that Dr. Zimmerman testified that the infection from the abscesses had gone so far that it would have done no good to drill into the teeth; but it is significant that Dr. Meacham made no such claim.

We think that the jury might have found, upon a view of the whole of the evidence, that the question of the possible grave consequences of immediate extraction did not receive from Dr. Meacham the consideration that it merited, and that had he given it such consideration his treatment would have been different.

A frequently cited case is *Staloch v. Holm*, 100 Minn. 276, 111 N. W. 264. The defendants practiced medicine as partners. One of them amputated the patient's badly mangled leg. The patient died, and the defendants were charged with negligence in per-

forming the operation at a time when the patient was suffering from shock. The experts who testified differed as to the scientific propriety of the doctor operating when he did, although the court observed that the overwhelming preponderance of testimony was in favor of the doctor. The court then said:

"But that the defendants should have prevailed on the merits, if the case had been governed by ordinary principles of negligence, is not the only consideration here. The determining point in the expert testimony is its certain result in these two propositions, namely: (1) Standard medical authorities and approved current practice recognize that there is a class of cases which justify a primary operation during a period of shock; (2) whether the present was or was not within that class depended upon the judgment of the surgeon who had examined all the conditions of the patient which were involved." (100 Minn. 286)

The difference between that case and the case at bar lies in this: That standard dental authorities and current practice do not approve extraction of an abscessed tooth in the presence of acute trench mouth unless that is the only means of giving the patient relief from pain—or at least the jury could have so found under the evidence. And the question whether such relief could not have been otherwise afforded than by extraction is left in dispute and was for the determination of the jury.

The defendant says in his brief that "if dentists disagree as to the proper method to pursue, a selection of one to the exclusion of the other does not constitute malpractice or negligence if it has the support of a respectable minority." Among the authorities cited

to this proposition is *Williams v. Poppleton,* supra, in which the following appears:

> "If the treatment is according to a recognized system of surgery, it is not for the court or jury to undertake to determine whether that system is the best among the many that may be adopted by different branches of the medical profession. It is sufficient if the practitioner follow any of the known and recognized systems." (3 Or. 145)

▆ This language was used by Upton, J., a member of this court sitting on circuit, in a charge to the jury. The court was submitting the matter to the jury as a question of fact. The case is not, therefore, authority for the view that the court must determine as a matter of law whether the treatment is according to a recognized system of surgery. The court may do so, of course, where the evidence on that question is free from conflict as in *Staloch v. Holm,* supra. But, where there is a difference of opinion among the experts as to the fact, the question should be submitted to the jury. *Vigneault v. Dr. Hewson Dental Company,* 300 Mass. 223, 15 N. E. (2d) 185, 129 A. L. R. 95; *Hewitt v. Eisenbart,* 36 Neb. 794, 55 N. W. 252; *Stohlman v. Davis,* 117 Neb. 178, 220 N. W. 247, 60 A. L. R. 658; *Zulinsky v. Greenblat,* 14 N. J. Misc. 345, 184 Atl. 806. In the state of Washington the rule seems to be that, even in the face of a conflict of expert opinion, the court may declare as a matter of law that the defendant has employed a recognized system of surgery. See *Fritz v. Horsfall,* 24 Wash. (2d) 14, 163 P. (2d) 148; *Peddicord v. Lieser,* 5 Wash. (2d) 190, 105 P. (2d) 5; *Dishman v. Northern Pac. Ben. Ass'n.,* 96 Wash. 182, 164 P. 943. But we are not prepared to follow the Washington decisions in this regard.

A most careful consideration of the record, and of the decisions of this and other courts in like cases, convinces us that no error was committed on the trial, that the plaintiff made a case sufficient to go to the jury, and that the questions at issue were fully and fairly tried and fully and fairly submitted by the court in its charge to the jury. That being so, the learned trial judge had no discretion to set the verdict aside and order a new trial. *Bean v. Hostettler*, 182 Or. 510, 188 P. (2d) 637; *Arthur v. Parrish*, supra, 150 Or. 588; *Timmins v. Hale*, 122 Or. 24, 33, 256 P. 770. And see *Van Lom v. Schneiderman*, 187 Or. 89, 210 P. (2d) 461.

It is perhaps unnecessary for us to add that nothing in this opinion is intended as an expression of our own views as to the merits of the case on the facts. Our only function is to determine whether there was any error of law which would justify the court's order. We do not decide ourselves that the defendant, a dentist of long experience and admitted high professional standing, was in any way at fault in his treatment of the plaintiff, but merely that the evidence was sufficient to authorize a jury in its discretion so to find.

The order setting aside the judgment must be reversed and the cause remanded to the Circuit Court with directions to reinstate the judgment on the verdict.